**MID AMERICA BANCORPORATION, INC., and Irwin L. Jacobs, Plaintiffs,**

v.

**BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM, Defendant.**

**Civ. No. 4–80–546.**

United States District Court, D. Minnesota, Fourth Division.

Dec. 18, 1980.

Thomas J. Sexton, Winthrop, Weinstine & Sexton, St. Paul, Minn., for plaintiff Mid America Bancorporation, Inc.

Melvin I. Orenstein, J. Kevin Costley, and Steven J. Johnson, Lindquist & Vennum, Minneapolis, Minn., for plaintiff Irwin L. Jacobs.

Thomas K. Berg, U. S. Atty., Minneapolis, Minn., and Neal D. Peterson, Gen. Counsel, Herbert A. Biern, Senior Counsel, and Neal D. Peterson, Asst. Gen. Counsel, Board of Governors of the Federal Reserve System, Washington, D. C., for defendant.

MacLAUGHLIN, District Judge.

This matter is before the Court on a motion by plaintiffs Mid America Bancorporation ("Mid America") and Irwin L. Jacobs ("Jacobs") to enjoin administrative proceedings commenced by defendant Board of Governors of the Federal Reserve System ("Board"). The hearing on the motion for preliminary injunction was consolidated with the trial on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2). The Board has moved to dismiss plaintiffs' motion for lack of subject matter jurisdiction, for failure to state a claim, or, in the alternative, for summary judgment.

STATEMENT OF THE CASE

Mid America is a multibank holding company organized and doing business under the laws of the State of Minnesota. Its principal place of business is in Minneapolis. Mid America owns virtually all the voting shares of seven banks located in the Minneapolis banking market. It is registered as a bank holding company under 12 U.S.C. § 1844(a), and is subject to the Board's examination and supervisory authority over bank holding companies, 12 U.S.C. §§ 1844(c) and 1818(b)(3).

Plaintiff Jacobs is a director of Mid America and currently owns approximately 87 percent of its outstanding common stock. He began acquiring Mid America stock in September, 1978, when he purchased 36 percent of the outstanding Mid America stock through a tender offer. In October of 1979, Jacobs entered into an option contract with four major shareholders of Mid America stock. These four shareholders were members of the Richards family, and they controlled approximately 54 percent of the total stock then outstanding. The option contract provided that the Richards family had entered into an agreement with Mid America whereby Mid America would redeem their stock, and that if the redemption were to be blocked by regulatory action, then Jacobs would have the option to purchase their stock for the same price. The purchase price of the stock was set at $16 per share, for a total of $7,500,000.

On November 21, 1979, Mid America filed a notice of the redemption with the Board pursuant to Regulation Y, 12 C.F.R. § 225.-6.[1] After an analysis of the proposal, the Board advised Mid America that the proposed increase in Mid America's indebtedness was excessive, would unduly burden the earnings and capital of Mid America's subsidiary banks, and would constitute an unsafe and unsound condition. The Board informed Mid America that it would initiate cease and desist proceedings under 12 U.S.C. § 1818(b) to block the transaction if Mid America proceeded with its plan. Rather than abandoning the redemption and directly purchasing the stock as provided in the option contract, Jacobs continued to pursue possibilities for completing a redemption[2] by attempting to determine what level of debt would be acceptable to the Board. Between November of 1979 and March of 1980, the Board staff and repre-

---

1. Section 225.6 of Regulation Y prohibits the purchase by a bank holding company of 10 percent or more of its outstanding voting shares without giving at least 45 days advance notice to the appropriate Federal Reserve Bank. The notice must include, among other things, the purposes of the proposed redemption, the number of shares to be redeemed, the number of shares outstanding, the consideration to be paid, the date for the proposed redemption, the names of the persons whose shares are to be redeemed, a description of the terms of any debt incurred to effect the redemption, a repayment schedule for the debt and, if the redemption is related to a change in control of the bank holding company, a copy of all agreements relating to that change in control. 12 C.F.R. § 225.6.

2. The redemption alternative presents certain long term investment advantages in the transfer of ownership of a bank holding company. These advantages include significant future tax savings since the holding company can repay its acquisition debt with "tax free" dividends from its subsidiary banks whereas dividends to the shareholder (Jacobs) would be subject to tax. See, 26 C.F.R. § 1.1501–14(a)(1) (1977). See also, Board of Governors v. First Lincolnwood Corp., 439 U.S. 234, 238 n. 4, 99 S.Ct. 505, 508 n. 4, 58 L.Ed.2d 484 (1978). In addition, the interest expense incurred by the holding company on its debt can be used as a deduction against the income of the subsidiary banks through the filing of consolidated tax returns. See 26 U.S.C. § 163, 26 U.S.C. § 1501–04.

sentatives of Mid America and Jacobs discussed amendments to the redemption proposal to make it acceptable to the Board from the standpoint of the safety and soundness of the bank holding company and its subsidiary banks.

On February 6, February 21, and March 12, 1980, Mid America and Jacobs forwarded to the Board amendments to Mid America's Regulation Y notice regarding the proposed redemption of its shares. The amendments contained a debt repayment schedule showing a 10 year amortization of the redemption debt and eight written commitments by Mid America and Jacobs. The amendments stated that the personal commitments of Jacobs were made "to ensure the ability of [Mid America] to serve as a source of financial strength for its subsidiary banks subsequent to the Redemption . . . ." Exhibit C–2 to Complaint, at 3. The commitments by Mid America and Jacobs were as follows:

(a) Jacobs agreed to purchase $1.5 million of new common stock of Mid America with the proceeds of the stock sale to be used to reduce immediately Mid America's bank borrowings associated with the stock redemption from $7.5 million to $6 million.

(b) Jacobs agreed to convert a $1.5 million Mid America note held by Jacobs Bag Company, a company owned and controlled by Jacobs, to Mid America common stock.

(c) Jacobs agreed to guarantee to Mid America that it would receive not less than $1 million by December 31, 1981, from the sale of certain foreclosed property held by Mid America, the after-tax proceeds of which Mid America would use to retire a portion of the $6 million debt that it incurred as a result of the stock redemption transaction.

(d) In the event that Mid America was unable to pay the $6 million in debt in accordance with a 10-year payment schedule submitted as part of the Regulation Y notice, Jacobs agreed to loan Mid America up to an aggregate amount of $3 million as needed, the proceeds of which would be used to service the $6 million loan should Mid America fail to meet its obligation in accordance with the 10-year payment schedule. Should any advance for this purpose remain outstanding more than two years, Jacobs then agreed to accept new common stock of Mid America for an aggregate purchase price equal to the outstanding advances.

(e) Mid America agreed not to declare or pay any corporate dividends unless its parent company debt to equity ratio was less than .3:1.

(f) Until the $6 million of debt was paid in full, Mid America agreed that it would not cause any dividends to be paid from its subsidiary banks that would cause their respective capital accounts to fall below 8 per cent of assets.

(g) Subject to regulatory approval, Mid America agreed to purchase and Jacobs agreed to sell, at book value, the $35 million Valley National Bank of North Mankato, Minnesota, owned by Jacobs.

(h) Mid America agreed not to require its subsidiary banks to pay management or other fees that are not reasonable in relation to the services rendered by Mid America.

See Exhibits C–2, C–3 and C–5 to Complaint. The amendments also included a provision that the commitments of Mid America and Jacobs would terminate upon the earliest of (1) Mid America achieving a debt to equity ratio of 30 percent; (2) payment in full of the debt Mid America incurred to effect the redemption (including all accrued interest); or (3) consent by the Board.

The Board initially disapproved the amended proposal. After more correspondence, and in reliance upon the commitments made by Mid America and Jacobs, the Board decided not to prohibit the proposed stock redemption transaction. In a letter dated April 10, 1980, the Board restated the commitments and made its approval contingent upon fulfillment of the commitments. It stated:

With respect to the personal committ- ments [sic] of Mr. Jacobs, the Board of

Governors expects Mr. Jacobs to maintain his financial affairs in a manner sufficient to permit the complete fulfillment of all personal committments made to the Board of Governors in connection with this transaction. Any failure by Mr. Jacobs to fulfill his committments to the extent required will be viewed by the Board of Governors as a disregard for the safety and soundness of the Holding Company and as a basis for formal supervisory action under the Financial Institutions Supervisory Act of 1966, as amended. Likewise, any deviation from the committments made by the Holding Company with regard to the affairs of its subsidiary banks or its own corporate practices may result in the initiation of formal supervisory action.

Exhibit H to Affidavit of Mathisen, at 3. The Board's letter approving the redemption transaction did not mention the termination provision.

Mid America consummated the stock redemption on April 15, 1980. As a result of the stock redemption, Jacobs' percentage of ownership of Mid America's outstanding voting stock increased from 36 percent to 87 percent. Within a short time, Jacobs announced that he intended to terminate his investment in Mid America. On May 2, 1980, Jacobs met with his personal staff and stated that he intended to either sell his Mid America stock or sell the subsidiary banks and liquidate Mid America. He cited rising interest rates and the high carrying costs of debt financed acquisitions as the reason for his decision. Jacobs announced his decision to the presidents of the subsidiary banks on May 23, 1980, and offered these presidents a period of time to propose offers to purchase.

By the end of July, 1980, Mid America had executed sales agreements for the sale of the stock of the seven subsidiary banks. Jacobs had also executed an agreement for the sale of Valley National Bank, the bank he had committed to transfer to Mid America under the stock redemption agreement. Mid America also filed a liquidation plan pursuant to section 337 of the Internal Revenue Code. Under the plan of liquidation, all of Mid America's debt, including the debt incurred in the stock redemption, would be paid from the $23 million it would realize from the sale of its subsidiary banks. The balance would be distributed to Mid America's shareholders.

After the execution of the purchase agreements, each individual purchaser filed an application under the Change in Bank Control Act, 12 U.S.C. § 1817(j), with the appropriate federal bank regulatory agency.[3] These applications were reviewed by the federal banking agencies to determine whether the proposed purchasers satisfied the financial qualifications established for bank ownership. Of the seven applicants, six have received approvals and one has received a disapproval.

Upon learning of Jacobs' plan to liquidate Mid America, the Board commenced an investigation to determine whether formal action should be taken to block the liquidation. On October 20, 1980, the Board took three formal administrative actions. First, it began administrative proceedings to determine whether a cease and desist order should issue by sending a Notice of Charges to Mid America and Jacobs. See 12 U.S.C. § 1818(b)(1). The Notice of Charges to Mid America and Jacobs set a hearing date of December 9, 1980. The Board's second action was to issue a Notice of Assessment of a Civil Money Penalty pursuant to 12 U.S.C. § 1847(b). This notice was included in the same document as the Notice of Charges. Subsequently, a hearing on the Notice of Assessment was ordered consolidated with the hearing on the Notice of Charges. The third action taken by the Board was the issuance of a Temporary Order to cease and

---

3. For national banks, the appropriate agency is the Comptroller of the Currency; for state banks that are not members of the Federal Reserve System, the appropriate agency is the Federal Deposit Insurance Corporation; for state banks that are members of the Federal Reserve System, the appropriate agency is the Board of Governors. 12 U.S.C. § 1813(q). In this case, it is undisputed that all of Mid America's subsidiary banks are either national banks or state nonmember banks.

desist pursuant to 12 U.S.C. § 1818(c). This action blocked the liquidation of Mid America or the sale of Valley National Bank pending the outcome of the hearing on the cease and desist proceedings.

On October 31, 1980, plaintiffs filed this action to enjoin all three of the Board's actions.

DISCUSSION

This case involves three major issues of administrative procedure. First, the extent of a district court's jurisdiction to enjoin administrative procedures must be determined. The second inquiry focuses on whether the Board exceeded its statutory authority by commencing its administrative action. The third issue is whether the Board's Temporary Order to cease and desist should be enjoined under the circumstances of this case.

Because these issues require analysis of the administrative procedures through which the Board regulates bank holding companies, the pertinent sections of the banking laws need to be summarized. The two relevant acts are the Bank Holding Company Act ("BHC Act"), 12 U.S.C. § 1841 *et seq.*, and the Financial Institutions Supervisory Act ("FIS Act"), 12 U.S.C. § 1818.

The BHC Act grants the Board authority to assess a civil money penalty against "[a]ny company which willfully violates any provision of this chapter, or any regulation or order issued by the Board pursuant thereto." 12 U.S.C. § 1847(a). The penalty may not exceed $1,000 for each day that the violation continues. The company must "be afforded an opportunity for agency hearing, upon request made within ten days after issuance of the notice of assessment" and the findings of the hearing must be "on the record pursuant to section 554 of Title 5," (part of the Administrative Procedure Act). 12 U.S.C. § 1847(b)(3). Under section 1848, judicial review of the final agency order is vested in the United States courts of appeals.

The FIS Act provides the Board with authority to commence cease and desist proceedings. Section 1818(b)(1) states:

If, in the opinion of the appropriate Federal banking agency, any insured bank ... is engaging or has engaged, or the agency has reasonable cause to believe that the bank ... is about to engage, in an unsafe or unsound practice in conducting the business of such bank, or is violating or has violated, or the agency has reasonable cause to believe that the bank ... is about to violate, a law, rule, or regulation, or any condition imposed in writing by the agency in connection with the granting of any application or other request by the bank or any written agreement entered into with the agency, [the agency may begin administrative proceedings by issuing a notice of charges.]

This section also requires that the notice of charges fix a time for a hearing to determine whether a cease and desist order should issue. Judicial review of such orders is placed exclusively in the United States courts of appeals. 12 U.S.C. § 1818(h)(2). In addition, Congress withdrew from the district courts the jurisdiction to enjoin or otherwise review administrative proceedings under section 1818. Section 1818(i)(1) provides:

[E]xcept as otherwise provided in this section no court shall have jurisdiction to affect by injunction or otherwise the issuance or enforcement of any notice or order under this section, or to review, modify, suspend, terminate, or set aside any such notice or order.

Pending the outcome of the hearing in the cease and desist proceedings, the Board may issue a temporary order to cease and desist. Section 1818(c) provides that when a federal banking agency determines that the violations or practices specified in the notice of charges

is likely to cause insolvency or substantial dissipation of assets or earnings of the bank, or is likely to seriously weaken the condition of the bank or otherwise seriously prejudice the interests of its depositors prior to the completion of the proceedings ... the agency may issue a temporary order requiring the bank ... to cease and desist from any such violation

or practice and to take affirmative action to prevent such insolvency, dissipation, condition, or prejudice pending completion of such proceedings.

12 U.S.C. § 1818(c)(1). However, the bank may apply to a United States district court for an injunction "setting aside, limiting, or suspending the enforcement, operation, or effectiveness of such order pending the completion of the administrative proceedings . . . ." 12 U.S.C. § 1818(c)(2). Each of these provisions is made applicable to bank holding companies by section 1818(b)(3).

■ These provisions evidence a carefully woven administrative scheme. The Board is authorized to investigate a wide variety of banking conduct—violations of laws, rules, written agreements with the Board, and unsafe or unsound practices. The breadth of this authority plus the provisions restricting and deferring judicial review indicate that Congress had great respect for the expertise and judgment of the Board. Therefore, district courts should not disrupt activities of the Board without clear justification.

## A. Jurisdiction to Enjoin Agency Action

The threshold issue of this motion deals with the jurisdiction of this Court to enjoin the three types of agency action involved here. Because of variations in the relevant statutes, each of the three administrative actions taken by the Board must be considered separately.

There is no doubt about this Court's authority to enjoin a temporary order issued under section 1818(c)(1). Section 1818(c)(2) expressly grants district courts the power to do so. Whether the Court should enjoin the Temporary Order issued in this case will be discussed in detail later.

■ The Court's jurisdiction to enjoin the Board's hearing on the Notice of Charges is not as clear. It is well established that Congress possesses broad power to establish the jurisdictional limits of lower federal courts. *Lockerty v. Phillips*, 319 U.S. 182, 187, 63 S.Ct. 1019, 1022, 87 L.Ed. 1339 (1943); *see generally* P. Bator, P. Mishkin, D. Shapiro, & H. Wechsler, Hart and Wech-

slers's *The Federal Courts and the Federal Court System*, 309–75 (2d ed. 1973). The withdrawal of jurisdiction in § 1818(i) clearly limits this Court's authority to enjoin Board proceedings. The language cannot be read literally, however. It must yield to an interpretation that permits a district court to enjoin Board actions that clearly exceed its statutory authority. The Supreme Court's interpretation of section 10(b)(3) of the Selective Service Act, 50 U.S.C. § 460(b)(3), is instructive here. Similarly to section 1818(i) of the FIS Act, section 10(b)(3) limits pre-induction judicial review of decisions by Selective Service Local Boards. In *Oestereich v. Selective Service System Board No. 11*, 393 U.S. 233, 89 S.Ct. 414, 21 L.Ed.2d 402 (1968) and in *Breen v. Selective Service Local Board No. 16*, 396 U.S. 460, 90 S.Ct. 661, 24 L.Ed.2d 653 (1970), the Supreme Court held that section 10(b)(3) did not prohibit pre-induction judicial review of a selective service board's classification when the petitioner was clearly statutorily entitled to an exemption or a deferment from service. In contrast, the Court held in *Clark v. Gabriel*, 393 U.S. 256, 89 S.Ct. 424, 21 L.Ed.2d 418 (1968), *Boyd v. Clark*, 287 F.Supp. 561 (S.D.N.Y.1968), aff'd per curiam, 393 U.S. 316, 89 S.Ct. 553, 21 L.Ed.2d 511 (1969), and in *Fein v. Selective Service System Local Board No. 7*, 405 U.S. 365, 92 S.Ct. 1062, 31 L.Ed.2d 298 (1972), that no pre-induction judicial review is available when a selective service board uses its discretion and judgment in classifying an inductee. To test the correctness or legality of the selective service board's decision, the inductee must use the post-induction judicial review procedures.

The distinction drawn in these cases has been applied to section 1818(i) by the Fifth Circuit. In *Manges v. Camp*, 474 F.2d 97 (5th Cir. 1973), the Comptroller of the Currency had prohibited the owner of the controlling interest in a national bank, Mr. Manges, from participating in the affairs of the bank. The Comptroller predicated his authority for the action on section 1818(g)(1), which provides for suspension of a bank officer or director from office when

such person is indicted for a felony involving dishonesty or breach of trust. There is no judicial review of suspensions under section 1818(g). Mr. Manges had been convicted of a felony involving dishonesty five years before he purchased stock in the bank. In upholding a district court's injunction of the Comptroller's action, the Fifth Circuit stated:

> There is, however, a very strong court created exception to withdrawal statutes. This exception comes into play when there has been *a clear departure from statutory authority*, and thereby exposes the offending agency to review of administrative action otherwise made unreviewable by statute.

474 F.2d at 99 (emphasis added). The court held that section 1818(g)(1) applies only to present felony charges, and that by suspending Manges for a past conviction, the Comptroller clearly exceeded his statutory authority.

*Groos National Bank v. Comptroller of the Currency*, 573 F.2d 889 (5th Cir. 1978) involves the same bank and bank owner as *Manges v. Camp*. After the decision in *Manges v. Camp*, the Comptroller began cease and desist proceedings to block the bank from making high-risk loans to certain individuals, one of whom was Manges himself. The proceedings were settled by a written agreement. One of the terms was that the bank would not make loans to or extend credit to Manges. Several years later Manges drew several checks on an account in a different bank and cashed the checks at Groos National Bank. When the checks bounced, the bank held them for a few days until they could be paid. The Comptroller viewed this short term extension of credit as a violation of the written agreement and commenced cease and desist proceedings by issuing a notice of charges. Manges attempted to enjoin the administrative proceedings by filing suit in a district court. He argued that the written agreement was invalid, and therefore the Comptroller was acting in excess of his statutory authority. The Fifth Circuit ruled that the district court had no jurisdiction in this case. It stated,

Section 1818 as a whole provides a detailed framework for regulatory enforcement and for orderly review of the various stages of enforcement; and section 1818(i) in particular evinces a clear intention that this regulatory process is not to be disturbed by untimely judicial intervention, at least where there is no "clear departure from statutory authority." *Cf. Manges v. Camp, supra* at 99. We note that the bank was free to argue the invalidity of the 1973 agreement in the course of the regulatory proceedings . . . .

573 F.2d at 895.

In the instant case, then, the issue of jurisdiction to enjoin the Board's cease and desist proceedings will be answered by determining whether institution of the administrative proceeding by the Board is a "clear departure" from its statutory authority.

Section 1818(i) does not limit the Court's jurisdiction to enjoin the hearing on the Notice of Assessment of Civil Money Penalty because the withdrawal of jurisdiction applies only to the FIS Act. The BHC Act contains no express withdrawal of jurisdiction provision such as section 1818(i). However, it does provide that any party aggrieved by an order of the Board under the BHC Act may obtain judicial review in a United States court of appeals. By conferring on the courts of appeals jurisdiction to review orders of the Board issued under the BHC Act, Congress precluded review of such orders by district courts. *Whitney National Bank in Jefferson Parish v. Bank of New Orleans and Trust Co.*, 379 U.S. 411, 420–22, 85 S.Ct. 551, 557–58, 13 L.Ed.2d 386 (1965); *Memphis Trust Co. v. Board of Governors*, 584 F.2d 921, 925 (6th Cir. 1978); *Investment Company Institute v. Board of Governors*, 551 F.2d 1270, 1278–80 (D.C.Cir. 1977). In addition, the doctrine of exhaustion of administrative remedies operates to bar premature judicial review of administrative agency action. Under this doctrine, courts withhold judicial relief to persons aggrieved by an agency's action until all avenues of potential relief from the agency

itself have been exhausted. *E. g., McKart v. United States*, 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194 (1969); *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51, 58 S.Ct. 459, 463, 82 L.Ed.2d 638 (1938). *See generally* 3 K.Davis, Administrative Law Treatise § 20.01 *et seq.* (1958 ed., 1970 and 1976 Supps.). However, the doctrine of exhaustion of administrative remedies also contains exceptions. For instance, the aggrieved party need not exhaust administrative remedies where the allegation is that the agency's procedures exceed constitutional bounds, *Allen v. Grand Central Aircraft Co.*, 347 U.S. 535, 74 S.Ct. 745, 98 L.Ed. 933 (1974), or where the agency has exceeded its statutory powers, *Skinner and Eddy Corp. v. United States*, 249 U.S. 557, 39 S.Ct. 375, 63 L.Ed. 772 (1919).

Thus, in the instant case the issue of the Court's jurisdiction to enjoin the Board's hearing on the Notice of Assessment of a Civil Money Penalty is much the same as jurisdiction to enjoin the Board's hearing on the Notice of Charges. The determination rests on whether the Board has statutory authority to assess a civil money penalty on plaintiffs.

B. *Statutory Authority of The Federal Reserve Board*

1. The Cease and Desist Proceedings

■ When construing a statute that invests broad regulatory powers in an administrative agency, great deference must be given to the officers or agency charged with administration of the statute. *Board of Governors v. First Lincolnwood Corp.*, 439 U.S. 234, 251, 99 S.Ct. 505, 514, 58 L.Ed.2d 484 (1978); *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Federal Deposit Insurance Corp. v. Sumner Financial Corp.*, 451 F.2d 898, 902 (5th Cir. 1972). "[T]he construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong." *Red Lion Broadcasting Co. v. F. C. C.*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969). The 1974 extension of the Board's

cease and desist authority to include bank holding companies was based on recommendations made to Congress by the Board. *59th Annual Report of the Board of Governors of the Federal Reserve System* 199 (1972); *60th Annual Report of the Board of Governors of the Federal Reserve System* 236 (1973). Because the Board was intimately involved in the enactment of the statute upon which it predicates authority to bring the cease and desist proceedings against plaintiffs, and because of the Board's great expertise and experience in regulating banking practices, its interpretation of the statutes involved in this matter is entitled to great weight.

The Board derives its authority to institute cease and desist proceedings against bank holding companies from sections 1818(b)(1) and (3) of the FIS Act. The Board has the power to investigate "unsafe or unsound practices," and violations of a law, rule, regulation or conditions imposed in agreements in writing by the Board. This power extends to past, present, or threatened future violations. The Board's remedial powers are also broad. If a violation is established at the hearing, the Board may issue an order that "require[s] the bank ... to cease and desist from the [violation or practice], and, further, to take affirmative action to correct the conditions resulting from any such violation or practice." 12 U.S.C. § 1818(b)(1).

■ If the Board is of the good faith opinion that a bank holding company is or has engaged, or is about to engage, in one of the practices or violations specified in section 1818(b)(1), it has the authority to issue a notice of charges. The Board's Notice of Charges to Mid America and Jacobs focuses on the written amendments to the November 21, 1979, Regulation Y notice submitted by Mid America and Jacobs to the Board. These amendments are the eight written commitments of Mid America and Jacobs to take certain actions if the redemption plan were approved by the Board. The Notice of Charges alleges that plaintiffs violated Regulation Y by including false and misleading information, and

by misleading the Board through the omission of other information.[4] It also alleges that plaintiffs are about to fail to fulfill the written commitments they undertook to obtain approval of the Regulation Y application. These allegations fall within the scope of the Board's authority under sections 1818(b)(1) and (3). Thus, there has been no clear departure from statutory authority, and this Court lacks jurisdiction to enjoin the Board's cease and desist proceedings.[5]

### 2. The Assessment of the Civil Money Penalty

■ Section 1847 grants the Board power to fine any company that "willfully violates any provision of this chapter [i. e., the BHC Act], or any regulation or order issued by the Board pursuant thereto." The Board's asserted basis for the assessment of the civil penalty against Mid America is a violation of Regulation Y, 12 C.F.R. § 225.6, which was promulgated pursuant to the BHC Act. The Board's Notice of Assessment alleges that Mid America violated Regulation Y by: (1) failing to state completely and truthfully the purpose of the redemption of stock as required by 12 C.F.R. § 225.6(a)(1); (2) filing a false and misleading schedule of repayment in violation of 12 C.F.R. § 225.-6(a)(6); and (3) misleading the Board by omitting to inform the Board of material information relevant to the redemption.

It is undisputed that Mid America is a bank holding company, that Jacobs is a director of Mid America, and that both are subject to the requirements of the BHC Act. The Notice of Assessments sets forth allegations of fact which, if established on the record at the hearing requested by plaintiffs, would establish a violation of Regulation Y by Mid America and Jacobs. On the basis of these facts, the Board's issuance of the Notice of Assessment of a Civil Money Penalty was within the Board's authority under the BHC Act. Accordingly, plaintiffs must exhaust their remedies available in the administrative proceedings.

### C. The Temporary Order to Cease and Desist

As stated earlier, this Court holds a specific grant of jurisdiction to enjoin a temporary order to cease and desist issued by a federal banking agency. 12 U.S.C. § 1818(c)(2). Although this statute provides little guidance to a district court faced with a decision of whether to enjoin a temporary order, it is amenable to a two-fold inquiry. First, the Court must determine whether the temporary order falls within the statutory authority of subsection (c)(1). This subsection requires that the violation or practice which induced the temporary order be one that "is likely to cause [1] insolvency or [2] substantial dissipation of assets or

---

4. Plaintiffs deny that Jacobs formed the intention to sell the subsidiary banks prior to the time when the redemption was carried out. However, for purposes of this motion, they argue that even if Jacobs did conceal from the Board an intention to liquidate Mid America, that this omission is immaterial. Whether there was an omission of this information and, if so, whether it was material or in violation of Regulation Y is a decision that should be made by the Board at the administrative hearing, not by this Court. By filing the Notice of Charges initiating the cease and desist proceedings, the Board has averred that plaintiffs concealed relevant information from the Board and that the information was material. The propriety of the filing of these charges is not subject to judicial review. *Federal Trade Commission v. Standard Oil of California*, 449 U.S. 232, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980).

5. Plaintiffs have maintained that the real issue in this matter is whether the Board has statuto-

ry authority to prevent the liquidation of a bank holding company. This argument misconstrues the distinction between activities over which the Board has been granted the power to regulate and activities the Board may control to remedy a violation or an unsafe or unsound practice. If, at the hearing, the Board were to determine that plaintiffs have violated Regulation Y or their written commitments to the Board, then the Board may choose to remedy the violation by preventing the liquidation of Mid America. This would be but one of many conceivable remedies available to the Board. It is not the province of this Court to decide whether such a remedy would be appropriate in this case. This decision must be made by a court of appeals, and then only after development of a record at the administrative hearing, and only if the Board chooses to impose such a remedy.

earnings of the bank, or [3] is likely to seriously weaken the condition of the bank or [4] otherwise seriously prejudice the interests of its depositors prior to the completion of the [cease and desist] proceedings." 12 U.S.C. § 1818(c)(1). The second part of the inquiry requires an exercise of the Court's discretion. The legislative history of this section states:

> In ruling upon any such application, the district courts will, of course, be guided by the traditional tests employed in actions for temporary or preliminary relief from administrative agency action when the public interest is involved.

S.Rep. 1482, 89th Cong., 2d Sess., [1966] U.S.Code Cong. & Ad.News 3532, 3542. The traditional tests for determining whether to grant preliminary relief from agency action are:

> The movant [Mid America] must show a substantial likelihood of success on the merits, and that irreparable harm would flow from the denial of an injunction. In addition, the trial judge must consider the inconvenience that an injunction would cause the opposing party [the Board], and must weigh the public interest as well.

*Quaker Action Group v. Hickel*, 421 F.2d 1111, 1116 (D.C.Cir.1969); *See McGuire Shaft and Tunnel Corp. v. Local Union No. 1791, U. M. W.*, 475 F.2d 1209, 1216 (TECA), cert. denied, 412 U.S. 958, 93 S.Ct. 3008, 37 L.Ed.2d 1009 (1973).

Plaintiffs strenuously contend that the Board lacks statutory authority to issue a temporary order in this case. They argue that Mid America's sales of the subsidiary banks were arm's length transactions, that it will receive a fair price for the assets, and therefore no dissipation of the assets will occur. This argument ignores the purpose of the Board's Temporary Order. If Mid America were to consummate the sales prior to the hearing on charges in the cease

and desist proceedings, then Mid America could be liquidated prior to the Board's decision on the merits. This would effectively moot the proceedings by neutralizing nearly all of the remedies the Board might seek to impose if a violation or unsafe or unsound practice is established. The Board's authority to issue temporary orders to prevent actions which threaten to seriously weaken the condition of a bank or bank holding company [6] certainly includes the power to prevent the liquidation of Mid America prior to the hearing on the merits in the cease and desist proceedings.

Turning to the traditional tests for issuance of preliminary injunctive relief, it is the conclusion of this Court that the motion for injunctive relief must be denied. After a careful consideration of the four factors, the balance scales distinctly favor the Board. The potential harm to plaintiffs caused by the temporary order, that the pending sales of the subsidiary banks will not be consummated, is not irreparable. Jacobs will still hold control of a financially sound holding company and there is no evidence that the subsidiary banks will be weakened if they are not sold. After granting due deference to the experience and expertise of the Board and to its role of regulating the banking industry to protect the investments of the public, it cannot be said that either plaintiffs' chances of success on the merits or the public interest factor cuts in favor of plaintiffs. Finally, granting an injunction would seriously inconvenience the Board because the injunction would destroy the status quo and effectively eliminate most of the remedies the Board might seek to pursue after the decision on the merits.

Accordingly,

IT IS ORDERED THAT:

(1) The portion of plaintiffs' motion directed at enjoining the Board's hearing on

---

**6.** The term "bank" in section 1818(c) must be read as encompassing bank holding companies also. The 1974 amendment of the FIS Act extended the application of section 1818(c) to include bank holding companies also. 12 U.S.C. § 1818(b)(3). Thus, under section 1818(c)(1), the Board has power to issue a temporary order to prevent a threatened weakening of a bank holding company pending the outcome of a cease and desist proceeding against that bank holding company.

the Notice of Charges issued pursuant to 12 U.S.C. § 1818(b)(1) be, and hereby is, dismissed for lack of subject matter jurisdiction.

(2) The portion of plaintiffs' motion directed at enjoining the Board's hearing on the Notice of Assessment of Civil Money Penalty issued pursuant to 12 U.S.C. § 1847 be, and hereby is, dismissed for failure to exhaust administrative remedies.

(3) The portion of plaintiffs' motion directed at enjoining the Board's Temporary Order to cease and desist pursuant to 12 U.S.C. § 1818(c) be, and hereby is, denied.

(4) The defendant's cross-motion for summary judgment affirming the issuance of the Temporary Order to cease and desist be, and hereby is, granted.

LET JUDGMENT BE ENTERED ACCORDINGLY.