**ADVANTA BANK, Plaintiff,**

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION, Defendant.**

**Civil Action No. 09–2423(JMF).**

United States District Court, District of Columbia.

Feb. 16, 2010.

Opinion Denying Stay Feb. 24, 2010.

Andrew L. Sandler, Buckleysandler, LLP, Washington, DC, for Plaintiff.

Thomas L. Holzman, Federal Deposit Insurance Corporation, Arlington, VA, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN M. FACCIOLA, United States Magistrate Judge.

This case was referred to me for all purposes. Currently pending and ready for resolution is *Plaintiff's Motion for a Temporary Restraining Order and/or Preliminary Injunction* [# 3]. For the reasons stated below, the motion will be granted.

### STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO DISPUTE

1. This case involves four related entities—Advanta Corp. is the parent company which owns Advanta Bank Holding Company ("Holding Company"). The Holding Company owns 100% of the shares of Advanta Bank (the "Bank"), the plaintiff. The Bank is affiliated with Advanta Bank Corp., Draper, Utah ("ABC"), an industrial bank whose primary business is issuing and servicing credit cards to small businesses. ABC is a first-tier subsidiary of Advanta Corp., the Bank is a second tier subsidiary of Advanta Corp.

2. As of September 30, 2009, Advanta Corp. had $2,082,899,000 in deposits,

$2,497,897,000 in assets, and $2,465,936,000 in total liabilities. Its year to date net income was negative $482,459,000. *Declaration of Julie D. Howland* ("Howland Decl."), ¶ 9.

3. As of September 30, 2009, ABC had $2,092,114,000 in deposits, $2,284,186,000 in total assets and a Tier 1 Leverage Capital Ratio of 3.73%. *Id.* at ¶ 8.

4. As of September 30, 2009, the Bank had $10,330,000 in deposits, $21,813,000 in total assets and a Tier 1 Leverage Capital Ratio of 39.39%. On November 30, 2009, the Bank's total deposits were $268,404 and its total assets equaled $10,249,951. *Id.* at ¶ 7. This indicated a reduction between September 30, 2009 and November 30, 2009 of $10,061,596 in deposits and of $11,563,049 in assets at the Bank. *Id.* In an application to terminate insurance received by the FDIC on January 13, 2010, the Bank indicated that it had divested itself of its remaining deposits and had approximately $10 million in assets. *Id.* at ¶ 7. The termination process which began in January will be completed June 30, 2010, at which point the Bank will no longer be insured by the FDIC.

5. In 2007, the Bank converted to a state-chartered nonmember bank. The Bank does not operate as a community bank; its primary activity is to provide deposit services for affiliate companies. According to a Report of Examination of the Bank, as of December 31, 2008, the FDIC was concerned that the Bank lacked any apparent plans for profitable operations and advised that "Management must either formulate a plan for offering banking activities to the public or submit a plan for voluntary liquidation and termination of deposit insurance." *Id.* at ¶ 5.

6. After deducting Bank and ABC assets and liabilities from Advanta Corp.'s accounts, there is $210 million dollars in Advanta only assets and $213 million in Advanta only debt. *Id.* at ¶ 9.

7. The Boards of Directors of the four entities are interlocking and have significant overlap. Four of the six directors of the Bank are inside directors who are executive officers or directors of Advanta Corp. Three of these four directors were also directors of ABC until November 13, 2009. *Id.* at ¶¶ 10–11. These directors resigned from ABC on November 13, 2009 at the request of the FDIC due to the FDIC's concerns about conflicting loyalties. *Id.* at ¶ 18.

8. In May of 2009, Advanta closed ABC credit cards to new transactions as a result of early amortization on a securitization trust, and ABC ceased issuing new credit cards. This resulted in significant liquidity problems for ABC. *Id.* at ¶ 13.

9. In June 2009, the FDIC and ABC stipulated to a Cease and Desist Order ("ABC Order") requiring ABC to maintain its Tier 1 Leverage Capital Ratio at a minimum of five percent. In compliance with this order, ABC advised the FDIC in October 2009 that its Tier 1 Leverage Capital Ratio was 3.73% as of September 30, 2009. *Id.* at ¶ 14. The FDIC ordered ABC to submit a capital restoration plan, which ABC refused to do. *Id.* at ¶ 18.

10. On November 8, 2009, Advanta and several subsidiaries, but not ABC or the Bank, filed a voluntary petition for reorganization under Chapter 11 of the United States Bankruptcy Code. *Id.* at ¶ 16.

11. On November 13, 2009, the FDIC was advised that Advanta would disaffirm a tax-sharing agreement with

ABC, which could have resulted in a $65 million payment to ABC and adequately capitalized ABC. At the same meeting, ABC suggested that the FDIC place ABC in receivership. *Id.* at ¶ 18.

12. ABC and the Bank both remain open. The risk posed to the Insurance Fund by ABC could, however, total several hundred million dollars due to the extremely high losses in its credit card portfolio. *Id.* at ¶ 19. Under the provisions of 12 U.S.C. § 1815(e), moneys remaining in the Bank at the time of the potential failure of ABC would be used to guarantee the deposits in ABC.

13. On November 19, 2009, the FDIC proposed that the Bank stipulate to a Cease and Desist order, which would restrict transactions between the Bank and Advanta and its affiliates and prohibit the payment of dividends. This order reflected the FDIC's concern about the interlocking management between Advanta and the Bank and the failure of the same directors to uphold their duties of care and loyalty to ABC. *Id.* at ¶ 21. The Bank rejected this stipulation pursuant to advice of counsel because of the Bankruptcy proceedings underway for Advanta Corp. *Id.* at ¶ 22.

14. During a review of the Uniform Bank Performance Report filed by the Bank, the FDIC Case Manager and an FDIC Examiner noticed that two questionable transactions had taken place between June 30, 2009 and September 30, 2009. *Id.* at ¶ 26. The Bank had reduced its liabilities by $5.3 million and had booked a tax-expense provision of $2.6 million. *Id.* These transactions were unusual due to "the size and nature of the Bank's activities." *Id.* The FDIC has attempted to gather an explanation via interviews and review of documents and has received no satisfactory explanation. *Id.*

15. Julie D. Howland, Assistant Regional Director, FDIC, and responsible for supervision of the Bank, recommended issuing a Temporary Cease and Desist Order to prevent the Bank from engaging in transactions with Advanta and other affiliates, which would cause dissipation of assets of the Bank. *Id.* at ¶ 27–30. She premised her recommendation on 1) the conflicts of interests of the interlocking directors of Advanta and the Bank, 2) the inability of the Bank to perform independent reviews and provide explanations of the irregular transactions, and 3) the Bank's failure to maintain adequate books and records.

16. The FDIC issued the Temporary Cease and Desist Order to the Bank on December 17, 2009 pursuant to 12 U.S.C. § 1818(c).[1]

17. The Bank responded with the instant litigation pursuant to its right under 12 U.S.C. § 1818(c)(2) to seek judicial review of the issuance of a Temporary Cease and Desist Order. The motion for a temporary restraining order or permanent injunction of the FDIC was briefed and oral argument was held on January 20, 2010. All parties agree that the case is ripe for adjudication and a final decision on the issuance of an injunction.

## CONCLUSIONS OF LAW

Section 8(b) of the Federal Deposit Insurance Act ("FDIA"), codified at 12 U.S.C. § 1818(b), grants Federal banking agencies the power to issue cease and desist orders if the agency has "reasonable

1. All references to the United States Code are to the electronic versions in Westlaw or Lexis.

cause to believe that the depository institution [is] ... about to engage in an unsafe or unsound practice ... is violating or has violated ... a law, rule or regulation." 12 U.S.C. § 1818(b)(1). Such an order is accompanied by notice of a hearing to be held not earlier than 30 or less than 60 days after service of the notice. The order becomes effective at the expiration of the 30–day period and remains effective until the conclusion of the administrative proceeding. Because some instances require regulatory action faster than the administrative process can accommodate, Congress also granted the Federal banking agencies the authority to issue a temporary cease and desist order. 12 U.S.C. § 1818(c)(1).[2] These temporary orders become effective upon service on the financial institution and remain in place until the conclusion of the administrative process. The FDIC issued a temporary cease and desist order because Advanta Bank refused to stipulate to a cease and desist order and because of the risk that any money in the Bank would be "upstreamed" to the bankrupt parent company to be used to pay off creditors instead of being held by the Bank and made available to cross guarantee the losses of ABC in the event it fails. The question before the court today is whether the issuance of that order exceeded the FDIC's authority granted by Congress in § 1818.

I. *FDIA § 8(c)*

The issuance of a cease and desist order under § 1818(b) is accompanied by a decision by a neutral arbiter determining whether the conduct of the depository institution was legitimate. Orders issued under § 1818(b) do not become binding until the conclusion of an administrative hearing. On the other hand, temporary cease and desist orders issued under § 1818(c) are binding upon service on the financial institution and remain in effect until the conclusion of the administrative process. Thus, a depository institution is bound by the conclusion of its adversary (in this case the FDIC) that it has or is about to engage in unsafe or unsound banking practices without neutral adjudication of that decision. Because of this, § 1818(c)(2) allows the institution to go to District Court to seek an injunction whenever the FDIC issues such a temporary cease and desist order. Thus, the requirements of § 1818(c) for the issuance of a temporary cease and desist order are stricter than those in § 1818(b).

The report from the Senate Committee on Banking and Currency to accompany the passage of the Financial Institutions Supervisory Act of 1966 explicitly notes that the FDIC must be reasonable in its determination that the threatened insolvency or dissipation of assets be likely. In discussing subsection (c)(1) the report notes that

> The appropriate Federal lending agency would have discretionary authority to issue such an order whenever it determined that the violations or threatened violations or practices, or the continuation thereof, are likely to cause insolven-

---

2. The text of § 1818(c)(1) reads as follows:
 Whenever the appropriate Federal banking agency shall determine that the violation or threatened violation or the unsafe or unsound practice or practices, specified in the notice of charges served upon the depository institution or any institution-affiliated party pursuant to paragraph (1) of subsection (b) of this section, or the continuation thereof, is likely to cause insolvency or sig-

 nificant dissipation of assets or earnings of the depository institution, or is likely to weaken the condition of the depository institution or otherwise prejudice the interests of its depositors prior to the completion of the proceedings conducted pursuant to paragraph (1) of subsection (b) of this section, the agency may issue a temporary order ...

cy or substantial dissipation of assets or earnings of the bank, or are likely to otherwise seriously prejudice the interests of its depositors.... The change in the language of the original bill from 'could cause' to 'is likely to cause' insolvency or substantial dissipation of assets or earnings, or 'is likely to' otherwise seriously prejudice the interests of depositors, is designed to reflect the Committee's intent that the possibility of such consequences be a reasonable one and not merely a theoretical one.

S.Rep. No. 1482, 89th Cong., 2d Sess. (1966), at 22, U.S.Code Cong. & Admin.News 1966 at 3532, 3553.

Because Congress was aware that the power it was granting to Federal banking agencies was a broad and extreme authority, the threshold requirements for meeting that bar were intentionally modified from "could cause" to "is likely to cause." The question before the court is whether the present facts meet that threshold.

The statute itself does not specify the standard by which the FDIC's exercise of its power to issue a cease and desist order, effective upon service, is to be judged. The Court is bound by the principle of statutory interpretation that each word in the statute matters[3] and that it must therefore appear that the Bank's actions are likely to cause insolvency or substantial dissipation of assets.

The legislative history of the statute states that "[i]n ruling on any such application, the district courts will, of course, be guided by the traditional tests employed in actions for temporary or preliminary relief from administrative agency action when the public interest is involved." S.Rep. No. 1482, 89th Cong., 2d Sess. (1966), at 22. But, there is little in the way of precedent in the interpretation of § 1818(c). Challenges to the issuances of

temporary orders are rare, and injunctions setting them aside even more so. Two other district courts faced with the interpretation of the same section have concluded that it must be read disjunctively. *Paul v. Office of Thrift Supervision*, 763 F.Supp. 568, 573 (S.D.Fla.1990); *Mid America Bancorporation v. Board of Governors*, 523 F.Supp. 568, 576–78 (D.Minn. 1980). That is to say, the "or" separating the requirements indicates that each of them must be read separately. Thus, the FDIC has the authority to issue a temporary order in situations where the actions of the financial institution are likely to cause:

(a) insolvency; or

(b) significant dissipation of assets; or

(c) weaken the condition of the institution; or

(d) otherwise prejudice its depositors.

12 U.S.C. § 1818(c)(1).

## II. *Application to the Present Case*

 The Bank contends that absent any harm to *its* depositors (not the depositors of ABC or any other entity) the application of the statute is inappropriate. All parties agree that the Bank is not going to fail and that the depositors of the Bank are not at risk. However, such a reading ignores the "or" within § 1818(c). The fact that the dissipation of assets will not necessarily harm the depositors of the Bank does not mean that the assets will not be dissipated, nor does it mean that the statute cannot be applied for that reason.

This, however, does not end the inquiry. The language of the statute and the intent of Congress as demonstrated by the Committee report is quite clear: temporary cease and desist order are only to be issued upon a finding that the continuation of unsafe or unsound banking practices

---

**3.** *Duncan v. Walker*, 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001).

must be the action which "is likely to cause ... [the] ... dissipation of assets or earnings of the depository institution." 12 U.S.C. § 1818(c)(1). This was the specific language which Congress changed from the draft versions of the legislation to the one which was ultimately passed. Congress sought to ensure that the causation of the dissipation of assets was closely linked to the conduct in question, not merely a theoretical consequence of that conduct.

The Notice of Charges accompanying the temporary cease and desist order, along with the declaration of Ms. Howland, specify what the FDIC believes are unsafe or unsound banking practices. The lack of independence of the Directors and their conflicting loyalties to both Advanta Corp., the bankrupt parent company, and the Bank have made it impossible for them to prioritize the interests of the Bank ahead of the parent company. This was the reason the Directors were removed from the ABC Board by the FDIC, and it helps to explain the failure of ABC, which threatens to leave the FDIC vulnerable to claims for hundreds of millions of dollars.

The Notice of Charges, however, does not indicate that the termination of the Bank itself is an unsafe or unsound practice, nor could it. The Bank was told by the FDIC that it either needed to formulate a plan to become profitable (i.e. begin community banking) or close and terminate its insurance. Given the choice between the two, the bank chose termination and began the process of returning money to its depositors and otherwise winding up its affairs. The FDIC cannot ask the Bank to begin termination, and then declare that termination, once it begins and nears its conclusion, is an unsafe or unsound banking practice. Nor does the FDIC claim that the unsafe banking practices (i.e., the conflicting duties of the Board of Directors) caused the termination. Thus, it is not the unsafe banking practices which are causing the dissipation of assets, but rather the process of termination, *which the FDIC started*, which are "dissipating" the assets. Under the statute, the FDIC can only issue a temporary cease and desist order where the possibility of the dissipation of assets is more than a theoretical consequence of the unsafe or unsound practice. Here the assets are being dissipated because the FDIC asked the bank to liquidate and terminate its insurance. While the liquidation (and thus the dissipation of assets) may, theoretically, be linked somehow to the unsafe or unsound practice, the statute and Congress, which passed it, require more. Thus, the FDIC acted outside the clear boundaries of § 1818(c)'s grant of authority in issuing the temporary cease and desist order.

The FDIC had entered into its cease and desist agreement with ABC in June of 2009 and knew of the relationships between ABC, the Bank and Advanta Corp. prior to the transmittal letter dated July 6, 2009 requiring the Bank to terminate its insurance and wind up its affairs. At that time, the FDIC could have worked to ensure that any money in the Bank be preserved in order to insure against losses at ABC, but it did not. Instead, it waited until a process that it helped to start was nearly complete to attempt to intervene and stop it, and, in doing so, exceeded its statutory authority. The deference due to the agency in interpreting § 1818(c) is not limitless and does not allow for the contravention of the law which gave that agency its authority.

Because the agency's issuance of a temporary cease and desist order was outside the bounds of a clear grant of authority from Congress, the plaintiff's motion for an injunction setting aside the temporary

cease and desist order pursuant to § 1818(c)(2) must be granted.

An Order accompanies these Findings of Fact and Conclusions of Law.

## MEMORANDUM OPINION

Currently pending and ready for resolution is the *Federal Deposit Insurance Corporation's Motion for Stay Pending Appeal and Supporting Memorandum of Points and Authorities* [# 16] ("Motion for Stay"). For the reasons stated below, the motion will be denied.

## BACKGROUND

On December 17, 2009, the Federal Deposit Insurance Corporation ("FDIC") issued a Temporary Cease and Desist Order ("Temporary Order") to Advanta Bank ("Bank"). Advanta Bank is a Delaware-chartered bank. The Temporary Order alleged that the Bank was engaging in or about to engage in unsafe or unsound banking practices which threatened to dissipate the assets of the institution. *Declaration of Julie D. Howland* ¶ 25[# 12] ("Howland Decl.") ("In my opinion the Bank is engaged in unsafe and unsound banking practices in that the Bank Board lacks necessary independence from the Bank's bankrupt parent holding company and that the Bank's Inside Directors have a conflict of interest which they have demonstrated when directing the affairs of the Bank and/or [Advanta Bank Corp., Draper Utah ("ABC")], and placed the priorities of the bankrupt Advanta above the priorities of its bank subsidiaries.").[1] After receiving the Temporary Order, the Bank filed *Plaintiff's Motion for a Temporary Restraining Order and/or Preliminary Injunction* [# 3] ("Plaintiff's Motion") asking the Court to enjoin the FDIC from enforcing the Temporary Order. After the matter was briefed by both parties, the Court held a hearing on January 21, 2010, where all parties agreed that the matter was ripe for adjudication and that the court should issue a final decision.

On February 16, 2010, I issued an order enjoining the FDIC from enforcing the Temporary Order because the issuance of the Temporary Order was outside the statutory authority of the FDIC as expressed by Congress. *See Order* [# 13] (2/16/10). I found that the FDIC had authority to issue a Temporary Order pursuant to 12 U.S.C. § 1818(c)(1)[2] only in cases where the alleged unsafe or unsound banking practices were likely to cause the dissipation of assets, which the FDIC sought to prevent. I concluded that, in the present case, the dissipation of the Bank's assets was not the result of the alleged unsafe or unsound banking practices, but instead was a result of the liquidation of the Bank's assets and termination of its deposit insurance, a process that the FDIC had requested the Bank to undertake. *Findings of Fact and Conclusions of Law* [# 14] (2/16/10) at 9–11. I concluded that the FDIC's issuance of the Temporary Order was beyond the scope of its statutory authority.

On the same day the Court enjoined the FDIC from enforcing the Temporary Order, the FDIC filed its motion for a stay. The Bank has filed its response brief as requested by the Court. I now deny the FDIC's motion.

---

1. The conduct and condition of ABC is related to the Bank only to the extent that the Bank's assets could be used to cross-guarantee any losses that ABC would suffer were it to fail. The Bank has denied these allegations as they relate to the Bank and to ABC. *Advanta Bank's Opposition to Federal Deposit Insurance Corporation's Motion for Stay Pending Appeal* [# 20] ("Bank's Opposition") at 2 n. 1–2.

2. All references to the United States Code are to the electronic versions in Westlaw or Lexis.

## DISCUSSION

### I. *Legal Standard for Issuance of a Stay Pending Appeal*

Last year the Supreme Court described the "traditional standards" for the issuance of a stay pending appeal as follows: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether the issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, ––– U.S. –––, –––, 129 S.Ct. 1749, 1756, 173 L.Ed.2d 550 (2009). The first two factors, likelihood of success on the merits and the injury to be suffered, are the critical factors. *Id.* at 1761. *See also id.* at 1763 (Kennedy, J., concurring) ("This is not to say that demonstration of irreparable harm, without more, is sufficient to justify a stay of removal. The Court has held that '[a] stay is not a matter of right, even if irreparable injury might otherwise result.'") (citing *Va. Ry. Co. v. United States*, 272 U.S. 658, 672, 47 S.Ct. 222, 71 L.Ed. 463 (1926)).

In ruling on the entitlement to a preliminary injunction or stay pending appeal, the court of appeals has emphasized that the traditional factors are "typically evaluated on a 'sliding scale.'" *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291 (D.C.Cir.2009) (quoting *Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 361 (D.C.Cir.2009)). While a strong argument in favor of one factor may excuse a relatively weaker showing on another factor, it must be recalled that the court of appeals framed the issue as follows: "Has the petitioner made a strong showing that it is likely to prevail on the merits of its appeal? Without such 'substantial indication of probable success [on the merits], there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review." *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir.1977); *see Davis*, 571 F.3d at 1292 ("But *Holiday Tours* did not eliminate the other factors. The court simply acknowledged that a lessor likelihood of success might suffice if each of the other three factors clearly favors granting the injunction.").

### II. *Analysis*

#### A. *Likelihood of Success on the Merits*

■ The FDIC argues that it is likely to succeed on the merits for two main reasons. First, it asserts that the Court erred in granting the injunction because it did not consider all of the required factors for doing so, only the likelihood of success on the merits. Motion for Stay at 3. But, as the Bank points out, all parties agreed that this issue was ripe for a final adjudication, not merely an order on the request for a preliminary injunction. Bank's Opposition at 5 ("The standards applicable to a decision on a preliminary injunction, including the requirement that movant demonstrate a substantial likelihood of irreparable harm, are not applicable to a decision on the merits."). While a transcript of the hearing the court held has not been filed, I specifically recall that I began the hearing by asking counsel whether they agreed that I should proceed to the final merits and that it was unnecessary to consider the application as one for a temporary restraining order to be followed by a second hearing on an application for a preliminary injunction. Both counsel agreed that I should proceed to final judgment, which is exactly what I did. Thus, in the Order, the Court did not issue a preliminary injunction or temporary order. Instead, the Court "enjoined and prohibited" the FDIC from enforcing the Temporary Order against the plaintiff. *Order* [# 13]

(2/16/10). Additionally, the Clerk of the Court issued a final judgment. *Judgment in a Civil Case* [# 18]. In other words, I viewed the matter as mutual motions for summary judgment on agreed upon facts and I entered judgment for the plaintiff. There, my responsibility began and ended. Whether either party had shown there was a likelihood of success on the merits, likelihood of substantial irreparable injury, or anything else was therefore irrelevant to my analysis of which party was entitled to final judgment.

The second argument the FDIC makes is that the factual underpinnings of the decision were faulty and that the Court misapprehended the sequence of events surrounding the issuance of the Temporary Order. Motion for Stay at 3–4. The FDIC asserts that, because it issued the Temporary Order in December, 2009 and did not receive the Bank's application for termination of insurance until January 13, 2010, the Temporary Order was issued prior to the termination process. *Id.* at 4. Under this view, any action taken by the Bank prior to January 13, 2010 could not possibly have been part of the liquidation and termination of the insurance. This interpretation of the sequence of events however fails to capture the reality of the Bank's intentions and the FDIC's knowledge of those intentions well before the January 13, 2010 application.

The Bank submitted two separate affidavits indicating that it was decreasing its deposits beginning in May 2009 and that the FDIC was aware of the Bank's intention to terminate its insurance in October of 2009. Plaintiff's Motion, Attachment 5 ¶¶ 3–6 (*Declaration of Michael Coco*) and Bank's Opposition, Attachment 1 ¶¶ 3–8 (*Declaration of Jay Dubow*). Additional-

ly, the Howland Declaration indicates that the FDIC requested that the Bank either liquidate and terminate its insurance or begin offering banking services to the public in a letter dated July 6, 2009. Howland Decl. ¶ 5. The Bank reduced its deposits between May 30, 2009 and September 30, 2009 by approximately $19 million and the Bank's Board resolved to liquidate and adopted a formal plan for liquidation on October 7, 2009. Bank's Opposition at 5–6. For the FDIC to now argue that no action prior to January 13, 2010 can be related to the liquidation and termination of insurance misapprehends the reality of the process that began months before the January, 2010 application. In any event, whether or when the FDIC had notice of the Bank's intention to liquidate had nothing whatsoever to do with whether the Temporary Order exceeded its statutory authority.

Finally, the FDIC contends that the failure of the Bank to maintain proper records is enough for the court of appeals to find that the Court's Order enjoining the Temporary Order should be overturned because that failure is a cause of the dissipation of the assets. Motion for Stay at 5. The FDIC believes that two questionable transactions took place and that, while it could ascertain how they happened, it is unable to discover why because of the failure of the Bank to maintain adequate records. *Id.*

Even assuming that this is correct, the FDIC has failed to demonstrate that these transactions were the cause of the dissipation of assets. Absent some new evidence [3] to the contrary, which the FDIC has not provided, it appears that the dissipation of assets at the bank was caused by

---

**3.** The Bank asserts that it provided the FDIC with all of the information that it asked for, and that it had not received any new requests and had in fact received confirmation from the FDIC that no further information was needed regarding the financial status or condition of the Bank. Bank's Opposition at 7.

the Bank's decision, at the FDIC's behest, to liquidate and terminate its insurance and not by the Bank's failure to maintain records pertaining to the two questionable transactions. Thus, I find that the FDIC is not likely to succeed on the merits. It has offered no new arguments as to why its statutory authority would allow it to issue the Temporary Order in this case and has offered no new evidence that the alleged unsafe or unsound practices, and not the process of liquidation and termination, were the cause of the dissipation of the Bank's assets.

### B. Likelihood of Irreparable Injury

The FDIC further contends that the likelihood of irreparable injury here is very great. Motion for Stay at 6. It bases this injury on the prospect of another bank, ABC, failing and costing the Insurance Fund hundreds of millions of dollars. If the Temporary Order is enjoined and the stay pending appeal is denied, any remaining assets in the Bank will be up-streamed to the bankrupt parent company and will no longer be available to cross-guarantee the losses at ABC. Id.

Because the harm in this case is economic, the FDIC must show either that the economic harm would threaten the existence of its business or that the moneys lost as a result of the lack of a stay would be unrecoverable. See, e.g., Wis. Gas Co. v. Fed. Energy Regulatory Comm'n, 758 F.2d 669, 674 (D.C.Cir.1985) ("The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm.") (citing Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n, 259 F.2d 921, 925 (D.C.Cir.1958) (per curiam). The judges of this Court have frequently concluded that insolvency to pay a damage award may constitute irreparable harm. Carabillo v. ULLICO Inc. Pension Plan and Trust, 355 F.Supp.2d 49, 55 (D.D.C.2004) ("economic loss may constitute irreparable harm where defendant would become insolvent or otherwise judgment-proof prior to the conclusion of litigation thus making the plaintiff's alleged damages unrecoverable"); Foltz v. U.S. News and World Report, Inc., 613 F.Supp. 634, 643 (D.D.C. 1985) (concluding that the unavailability of assets to pay a damage award would irreparably injure the plaintiffs).

In this case, the liquidation of the Bank and the bankruptcy of the parent company would render the Bank judgment proof. If, in the process of the liquidation of the Bank, the remaining assets are transferred to the bankrupt parent company, the likelihood of the FDIC being able to recover those assets is very low.

If the economic harm is indeed irreparable, the FDIC's measurement of that harm is, however, inaccurate. The FDIC characterizes the amount of harm as in the hundreds of millions of dollars because that is the amount which the Insurance Fund may have to cover if ABC fails. However, this amount is not the proper measure of harm in this case. The harm to the Insurance Fund resulting from the Court's Order can only be measured by the amount of money dissipated from the Bank as a result of unsafe or unsound practices. Even if the FDIC is correct and the decisions by the Board and the Bank to liquidate and to return money to depositors were illegitimate decisions made by parties with conflicts of interest, the amount of money available to cross-guarantee the losses at ABC is not near the total amount ABC threatens to lose and cost the Insurance Fund. Nevertheless, while the harm is not as great as

FDIC claims, the likelihood that it will become at best another creditor in bankruptcy of an insolvent bank establishes a sufficient showing of irreparable harm.

### C. Harm to Other Interested Parties

From an economic point of view, the harm to the Bank from a stay could be described as minimal or nonexistent because it merely maintains the situation that has been in place since the Temporary Order was issued in December until the FDIC hearing is held in April. But, it is impossible to ignore that issuing a stay would grant the FDIC permission to do in the interim the very thing that I found it lacked the authority to do in the first place. As the Bank notes, taken to its logical conclusion, this basically allows the FDIC to act outside its statutory authority provided it is not causing irreparable harm to the institutions it is regulating. *See* Bank's Opposition at 4. Granting a stay severely prejudices the Bank by eliminating any recourse the Bank would have against the FDIC's illegal exercise of authority. This cannot be the case. The legality of the government's actions do not turn on the amount of harm it causes, but instead on the expressed boundaries of authority given to the agency by Congress. Accepting the argument that preventing the Bank from doing what it had the right to do is harmless because the prejudice caused it by the governmental usurpation is "merely economic" and therefore not "irreparable" eliminates the statutory check that Congress created on the FDIC's authority. What is supposed to be a rare "intrusion into the ordinary processes of administration and judicial review" [4] would be commonplace, as long as a government agency could do exactly what it was not authorized to do while at the same time justify its continued usurpation on the spurious grounds that the status quo was being maintained during the appeals process.

### D. The Public's Interest

The public has an obvious interest in not paying for the mismanagement of failed banks any more than it already is. On the other hand, the public has at least an equal interest in restraining federal agencies to the limits Congress has set. Thus, evaluation of this factor rests in equipoise.

## CONCLUSION

Considering the appropriate factors, I find first that, while threatened with irreparable harm, the FDIC has a low likelihood of success on the merits. Second, the issuance of the stay would be highly prejudicial to the Bank since it is being prevented from doing what it could otherwise do but for the illegal authority asserted by the FDIC. Finally, although the public interest in conserving taxpayer's money is equal to the interest in restraining FDIC to the limits on its authority that Congress set, I nevertheless conclude that the low likelihood of success on the merits coupled with the prejudice that the Bank would suffer warrant denying the stay.

An Order accompanies this Memorandum Opinion.

---

4. *Holiday Tours,* 559 F.2d at 843.