573 F.2d 889
 GROOS NATIONAL BANK and Clinton Manges, Plaintiffs-Appellants,
v.
COMPTROLLER OF the CURRENCY, Defendant-Appellee.
GROOS NATIONAL BANK OF SAN ANTONIO, TEXAS, and Clinton
Manges, Petitioners,
v.
UNITED STATES of America, DEPARTMENT OF the TREASURY, OFFICE
OF the COMPTROLLER OF the CURRENCY, Respondent.
 Nos. 76-4065, 77-1398.
 United States Court of Appeals,
Fifth Circuit.
 May 26, 1978.
 
 Robert L. Schwind, William R. King, Atlanta, Ga., for plaintiff-appellant Clinton Manges and intervenor Helen Ruth Manges.
 Bernard Ladon, San Antonio, Tex., for Groos Nat. Bank.
 John E. Clark, U. S. Atty., Jeremiah Handy, Archie Carl Pierce, Asst. U. S. Attys., San Antonio, Tex., Ronald R. Glanz, Mary Gallagher, Attys., Civ. Div., Dept. of Justice, Washington, D. C., Barbara Allen Babcock, Asst. Atty. Gen., for defendant-appellee.
 Petition for Review of an Order of the Department of the Treasury, Office of the Comptroller of the Currency.
 Before MORGAN and GEE, Circuit Judges, and KING*, District Judge.
 GEE, Circuit Judge:
 
 
 1
 These two cases concern the efforts of the Comptroller of the Currency to cope with the relationship between the Groos National Bank, a nationally chartered banking association in San Antonio, Texas, and its chief shareholder, Clinton Manges. These efforts have continued for some time, and a certain amount of background information is necessary in order to comprehend the present controversy.
 
 
 2
 Mr. Manges acquired a controlling interest in the Groos National Bank in early 1971. Manges had a prior criminal record, and the Comptroller of the Currency attempted to bar his participation in the bank's affairs for that reason; but the Comptroller's restrictions on Manges' voting of his shares were overturned in the 1973 case of Manges v. Camp, 474 F.2d 97 (5th Cir. 1973). Thereafter Manges, as majority shareholder, was able to control the bank and its board of directors. The Comptroller's office continued to scrutinize the bank and Manges' relationship to it, and its examinations later in 1973 turned up several practices that the Comptroller considered illegal or unsafe. These chiefly concerned a large percentage of high-risk loans, and more particularly a very high concentration of loans to two individuals one of whom was Manges himself along with persons whom the Comptroller considered to be closely related to these two, either by family or business connections. To allay these practices, the Comptroller set in motion cease and desist proceedings as authorized by 12 U.S.C. § 1818. However, instead of prosecuting these matters to a final cease and desist order, the parties including the Comptroller, Groos National Bank, and Manges in his individual capacity entered an agreement on November 14, 1973. The agreement included a number of measures to deconcentrate the bank's loans and to render them less risky. Among other clauses, the one central to the present controversy is Article II, forbidding all loans or extensions of credit, direct or indirect, to any shareholder owning five percent or more of the bank's voting securities, as well as to such a shareholder's "related companies or individuals." The article defined the latter phrase to include business associations and family relations of the shareholder.[1]
 
 
 3
 The next chapter of this saga opened on January 5, 1976, when national bank examiners discovered three transactions at Groos National Bank, all of which the Comptroller regarded as extensions of credit to Mr. Manges in violation of the 1973 agreement. The first of these transactions occurred on December 5, 1975, when Mr. Manges cashed a check at Groos National Bank for $50,000. The check was payable to the order of cash on Mr. Manges' account at the First State Bank and Trust Company of Rio Grande City.[2] In laymen's language, the check bounced. First State Bank returned this check unpaid to Groos National with the notation "refer to drawer" and only paid it on January 7, 1976, upon its third submission by Groos National Bank. The second transaction was rather similar: on December 6, 1975, Manges made out a check for $60,000 payable to one Perry Horine, again drawn on Manges' First State account. This check was deposited to Mr. Horine's account at Groos National Bank; but it, too, was returned unpaid by First State Bank and was not paid to Groos until January 7, 1976, upon its third submission by Groos National. It appears that Mr. Manges, upon inquiry from the president of Groos National Bank when the checks were returned, explained that he had expected the checks to be covered by a loan that he was arranging, the proceeds of which were to be deposited for him at First State Bank. For this reason, Groos National continued to submit the checks to First State Bank. The actual date of payment on these checks, January 7, 1976, was of course two days after the national bank examiners discovered the items; the Comptroller maintains that payment was made in response to the examiners' discovery.
 
 
 4
 The third transaction occurred on January 2, 1976, when Groos National Bank, on the request of Manges, charged the account of Clinton or Helen Ruth Manges $80,000 and transferred the funds to the account of the Harlingen National Bank for the credit of one Dial M. Dunkin. This transfer created a overdraft of over $68,000 in the Clinton or Helen Ruth Manges account at Groos National. This overdraft, too, was paid through the First State Bank on January 7, 1976.
 
 
 5
 Thus, in each of these transactions Manges enjoyed the use of Groos National Bank funds for a period of days. The Comptroller, viewing these transactions as substantial, albeit short-term, extensions of credit to Manges, prepared to bring cease and desist proceedings against Groos National Bank based on the violation of the 1973 agreement. Before these were completed, however, Groos National and Manges ran through a quite extraordinary maze of procedural maneuvers, the resolutions of which form the basis for a part of this case.
 
 
 6
 The bank's and Manges' first move was an attempt to steal a march on the Comptroller: just before the agency began formal proceedings, Manges and the bank brought an action in the federal district court on May 3, 1976, seeking a declaratory judgment that the 1973 agreement was invalid, as well as an injunction against any action by the Comptroller based on this agreement. Two days later the Comptroller nevertheless issued a notice of charges under 12 U.S.C. § 1818(b), alleging that the bank had operated in an unsafe and unsound manner and reciting the violations of the 1973 agreement. Accompanying the notice of charges was a temporary cease and desist order under 12 U.S.C. § 1818(c)(1), prohibiting the bank from extending credit to Manges or to several of his relatives and business associations, as well as certain other named persons, forbidding the bank from maintaining a demand deposit account for Manges, and generally requiring the bank to adhere to the terms of the 1973 agreement.
 
 
 7
 Groos National Bank's response was a "First Supplemental Complaint" in its case in the district court, seeking an order suspending the notice of charges and temporary cease and desist order pending determination of the validity of the 1973 agreement. A "Second Supplemental Complaint" sought to enjoin the Comptroller from further investigations.
 
 
 8
 To this the Comptroller answered with a broadside of his own, including various motions to dismiss the bank's action and to enjoin alleged violations of the temporary cease and desist order. On all these points the district court ruled in favor of the Comptroller, and Groos appeals these rulings in No. 76-4065, to which we shall return shortly.
 
 
 9
 While all these proceedings were taking place in the district court, however, administrative action continued on the enforcement of a permanent cease and desist order. As is required by 12 U.S.C. § 1818(b)(1), the notice of charges stated a date for an administrative hearing to determine whether a permanent cease and desist order should issue with respect to the violations charged in the notice of charges. This hearing was held on July 7, 1976; on September 16, 1976, the Administrative Law Judge entered his recommendation that a permanent cease and desist order be issued, based upon his finding that Groos National Bank had violated the 1973 agreement and that, in addition, the practices complained of constituted unsafe and unsound banking practices. With certain modifications the Comptroller accepted the ALJ's conclusions and issued a final cease and desist order on January 27, 1977. The bank and Manges, joined by several intervenors, appeal this final order in No. 77-1398.
 
 
 10
 Since these two cases raise several points about the administrative procedures through which the Comptroller regulates banking practices, we briefly recapitulate some pertinent sections of the banking laws. The Comptroller's power to initiate cease and desist orders in the present case was based on 12 U.S.C. § 1818(b)(1). Section 1818 applies to banks insured through the Federal Deposit Insurance Corporation, and among other things it authorizes the appropriate regulatory agency in this case the Comptroller (12 U.S.C. § 1813(q)) to deliver on the insured bank notice of charges in the event that the agency has reasonable cause to believe that the bank is engaged in an "unsafe or unsound practice" or is violating a law, rule, or regulation, or agreement entered into with the agency. This notice of charges must fix a time for a hearing to determine whether an administrative cease and desist order shall issue; such an order may issue if the agency finds the violation or unsafe or unsound banking practice specified in the notice of charges. Judicial review of final agency cease and desist orders is placed in the United States Circuit Courts of Appeal by 12 U.S.C. § 1818(h). However, pending the outcome of action on a cease and desist order, the regulatory agency may issue a temporary cease and desist order if it determines that the violation or threatened violation in the notice of charges is likely, among other things, seriously to prejudice the interests of the bank's depositors. 12 U.S.C. § 1818(c). A bank served with such a temporary cease and desist order, however, may apply in the United States District Court for an injunction to suspend or modify the temporary order. 12 U.S.C. § 1818(c)(2). By the same token, the regulatory agency may apply to the district court for enforcement of the temporary order. 12 U.S.C. § 1818(d). Finally, 12 U.S.C. § 1818(i) provides that no court shall have jurisdiction "to effect by injunction or otherwise the issuance or enforcement of any notice or order under this section," except as provided in section 1818 itself.
 
 
 11
 Taken together, these provisions establish a closely meshed administrative structure through which the Comptroller may curtail unsafe banking practices or legal violations through cease and desist orders that are reviewable in the circuit courts and, where necessary, may provide interim security through temporary orders that may be challenged or enforced through the district courts.
 
 
 12
 It was this administrative machinery that Groos National Bank and Manges attempted to circumvent by their action for declaratory judgment in No. 76-4065, in which they sought a determination that the 1973 agreement was invalid and that no enforcement should proceed on the basis of that agreement. The district court ruled that it had no jurisdiction to issue such a declaratory judgment, since 12 U.S.C. § 1818(i) withdrew its jurisdiction. We agree. The bank and Manges requested an injunction as well as a declaratory judgment in their favor; section 1818(i) in terms removes the court's jurisdiction to issue an injunction affecting the regulatory agency's notice or order, except as provided in section 1818 proceedings and review. We think that appellants' action for declaratory judgment also falls within the section's removal of jurisdiction over actions that "otherwise" affect the "issuance or enforcement of any notice or order." Section 1818 as a whole provides a detailed framework for regulatory enforcement and for orderly review of the various stages of enforcement; and section 1818(i) in particular evinces a clear intention that this regulatory process is not to be disturbed by untimely judicial intervention, at least where there is no "clear departure from statutory authority." Cf. Manges v. Camp, supra at 99. We note that the bank was free to argue the invalidity of the 1973 agreement in the course of the regulatory proceedings, and it did indeed so argue; and for the reasons to be discussed below, we are unimpressed with Manges' argument that he was unfairly treated because he was not a direct participant in these regulatory proceedings. Even without regard to section 1818(i), we would have serious doubts as to the only jurisdictional basis that appellants assert for their declaratory judgment action, namely 28 U.S.C. § 1348. This section gives original jurisdiction to the district courts over injunctive actions by banking associations against the Comptroller, but it appears to apply only to the Comptroller's responsibilities under Chapter 2 of the banking acts. The present action concerns the Comptroller's duties and authority under Chapter 16 of the banking acts. The declaratory judgment statute, 28 U.S.C. § 2201, is of course not an independent grant of jurisdiction. The district court was correct in viewing itself as without jurisdiction over the appellants' initial plea for declaratory and injunctive relief outside the context of the administrative proceeding.
 
 
 13
 The district court in No. 76-4065 also disposed of the issue raised in Groos National Bank's and Manges' "First Supplemental Complaint," namely their effort to enjoin the Comptroller's further investigations pending the outcome of the case, on the grounds that these investigations were arbitrary harassment. The district court held that it had jurisdiction to hear this complaint even though the institution of more than semi-annual investigation is a matter within the Comptroller's discretion. See 12 U.S.C. § 481; 5 U.S.C. § 701(a)(2), § 706(2)(A). However, the court held that "as a matter of law" there had been no arbitrary action or abuse of discretion. In the absence of any evidence to the contrary, we see no reason to disturb this finding. In any event, this request for temporary relief is mooted by our decision in No. 77-1398, disposing of the entire case.
 
 
 14
 Finally, the district court in No. 76-4065 disposed of several matters relating to the temporary cease and desist order by dismissing the appellants' prayer to enjoin the temporary order and by granting the Comptroller's counterclaim to enforce that order. Since the temporary order was dissolved upon entry of the final cease and desist order, the trial court's actions with respect to the temporary order are now moot. As the district court correctly noted, any residual issues are to be resolved in this court's review of the final administrative order, as is provided under 12 U.S.C. § 1818(h).
 
 
 15
 We turn now to that review, in No. 77-1398. The Comptroller of the Currency, upon review of the record evidence and administrative hearing before the ALJ, determined that Groos National Bank had by its conduct violated a valid agreement, as specified in the notice of charges, and that the bank's conduct was also "unsafe and unsound" within the meaning of the national banking laws. In view of these findings, the Comptroller issued a final cease and desist order very similar to the 1973 agreement and the temporary cease and desist order. Aside from a narrow exception to deal with bankruptcy exigencies, this final order prohibits credit and loan transactions between Groos National Bank and Manges or his relatives or business associations, as these are defined in the order. It also prohibits the bank from accepting or retaining any deposit for the account of these persons. In addition, it requires the specific authorization of the regional administrator of national banks for any extensions of credit to any persons (or their relatives or associated enterprises) having a controlling interest in the bank.[3]
 
 
 16
 The bank, Manges, and the intervenors (consisting of Manges' relatives and related businesses as defined under the order) attack this final order upon issues that fall into several categories. First, they argue that there was no substantial evidence in the record for the Comptroller's conclusion that Groos National Bank engaged in unsafe or unsound banking practices. Second, they argue that for various reasons the Comptroller's cease and desist order was overbroad. Finally, they argue that the order was arrived at through defective procedures and thus unconstitutionally curtailed Manges' and the intervenors' rights to contract. We regard these arguments as meritless.
 
 
 17
 Taking these points in order, we first consider the question of substantial evidence for the Comptroller's findings.[4] We note, first, that the statute permits a cease and desist order to be predicated not only on a finding of an unsafe or unsound banking practice as such but also on a finding of violation of a written agreement entered into between the regulatory agency and the bank in question. 12 U.S.C. § 1818(b). Petitioners maintain that the 1973 agreement was invalid and that the order could therefore be based only upon a finding of unsafe or unsound banking practices without respect to violation of the 1973 agreement. They say that the agreement was invalid because it lacked consideration. This argument is without merit. The statute provides that a cease and desist order may issue upon any violation of an agreement between the agency and a bank and says nothing of consideration. Nor is there any reason to import the common law of consideration, proper to private contractual relations, into the relationships between a regulatory agency and the entity it regulates. The Comptroller is authorized by statute to exercise extensive controls upon banks; the statute clearly contemplates that agreements may occur between the Comptroller and banks; and if the Comptroller does enter such an agreement by way of attaining voluntary compliance, we will not introduce the trappings of common-law contractual consideration to question that agreement. To do so would deeply intrude upon the regulatory agency's legitimate efforts to substitute voluntary agreement for formal cease and desist proceedings. As we have stated in the context of agency rulemaking, "we ordinarily will defer to an agency's choices concerning its procedures because in making such choices agencies are best situated to determine how they should allocate their finite resources." Superior Oil Co. v. Federal Energy Regulatory Commission, 563 F.2d 191, 201 (5th Cir. 1977). Moreover, it is clear that the 1973 agreement did entail the "consideration" of at least temporary postponement of cease and desist proceedings. Whatever the circumlocution of the agreement's preamble, it clearly required the Groos National Bank to refrain from extending credit to Mr. Manges. Manges himself was a signatory to this agreement. The notice of charges in the present case specified three instances of such extensions of credit, and the record clearly supports a finding that these three transactions took place, that they were extensions of credit, and that they therefore violated the 1973 agreement. In addition, the Comptroller also found that these transactions were unsafe and unsound banking practices in themselves, without respect to the 1973 agreement. There is substantial evidence in the record to support that conclusion. See First National Bank of Sikeston v. Transamerica Insurance Co., 514 F.2d 981 (8th Cir. 1975).
 
 
 18
 The petitioners' and intervenors' second line of argument is that the order itself was overbroad. They maintain that there was no substantial evidence that the bank's continued dealings with Manges and his affiliates constituted unsafe and unsound banking practices. This argument confuses the Comptroller's findings with his authority to frame a remedial order. Substantial evidence is required for the Comptroller's findings, but once the Comptroller finds a violation he may, within his allowable discretion, fashion relief in such a form as to prevent future abuses. Federal Trade Commission v. Mandel Brothers, Inc., 359 U.S. 385, 392-93, 79 S.Ct. 818, 3 L.Ed.2d 893 (1959). We find no abuse of discretion in this order, which encompasses the essential elements of the earlier agreement and which clearly relates to problematic practices that have occurred in the past.
 
 
 19
 Manges' and the intervenors' final set of arguments attacks the regulatory procedures on which this final order is based, saying that these procedures interfere with their right to contract. This, they say, is because: (1) the phrase "unsafe or unsound" lacks definite meaning and cannot be used as a basis for depriving them of any rights; and (2) the administrative procedures gave petitioner Manges and the intervenors no opportunity to participate and thus deprived them of a right without notice or hearing.
 
 
 20
 These arguments are without foundation. They incorrectly presuppose that some constitutional right of petitioner Manges or of the intervenors was in fact infringed by the regulatory proceedings. But these persons cannot claim a constitutionally protected right to do business with a particular bank. It is well established at common law that a bank may decline or terminate a deposit relationship. See 9 C.J.S. Banks & Banking § 268. The banking laws, of which all citizens are on notice, regulate banks' conduct of business generally, and if bank customers have any interest in or expectation of doing business with a bank, that interest or expectation is subject to the Comptroller's legitimate regulatory authority over the bank. See Norman v. Baltimore & O. R. Co., 294 U.S. 240, 55 S.Ct. 407, 79 L.Ed. 885 (1935). We fail to see why Manges' status as chief shareholder should give him any greater right to do business with the bank than other customers have.[5] Hence, no constitutionally protected rights of petitioner Manges or the intervenors have been infringed. Even if this were not the case, we would find their arguments very frail. The phrase "unsafe or unsound banking practice" is widely used in the regulatory statutes and in case law, and one of the purposes of the banking acts is clearly to commit the progressive definition and eradication of such practices to the expertise of the appropriate regulatory agencies. As for notice and participation in the administrative proceedings, it is clear that Manges at least had actual notice; and if he disapproved of the actions of the bank's officers and directors in these administrative matters, his remedy as majority shareholder was to install new directors. In any event, the bank's officers in these proceedings have consistently argued the same position as Manges and the intervenors.
 
 
 21
 The suggestion has been raised outside the record that Clinton Manges no longer has a controlling interest in the Groos National Bank. If this is so, and if the bank or other parties to this action believe that this contingency may be reason for modification of the cease and desist order, they should apply through appropriate channels to the Comptroller. The Comptroller may amend or terminate the order in accordance with its terms; the well-established doctrine of exhaustion of administrative remedies particularly where further factfinding may be required dictates that at the present stage of the proceedings any request for modification should be taken up initially with the Comptroller. See American General Insurance Co. v. Federal Trade Commission, 496 F.2d 197 (5th Cir. 1974).
 
 
 22
 The action of the district court in No. 76-4065 is AFFIRMED. The order of the Comptroller in No. 77-1398 is AFFIRMED.
 
 
 
 *
 United States District Judge of the Southern District of Florida, sitting by designation
 
 
 [1]
 The article in its entirety reads:
 ARTICLE II
 (A) The BANK shall make no loans or extensions of credit the proceeds of which are used in any way, directly or indirectly, for the benefit or accommodation of any shareholder owning five percent or more of the voting securities of the BANK or any related companies or individuals. The BANK shall make no loans or extensions of credit upon the security of obligations issued, guaranteed or endorsed by any shareholder owning five percent or more of the voting securities of the BANK or any related companies or individuals.
 (B) As used in this Agreement the phrase and its variations "related companies or individuals" shall mean any of the following relationships which were in existence on or after January 1, 1972:
 any company, partnership, association, other business entity or individual controlled either directly or indirectly by any shareholder denoted in Paragraph (A) of this Article. As used herein a "controlled" party shall include, but not be limited to:
 (1) immediate family members of any shareholder denoted in Paragraph (A) of this Article, and including parents, sister(s), brother(s), husband, wife, son(s), daughter(s), brothers-in-law, sisters-in-law, sons-in-law, and daughters-in-law;
 (2) an obligor on a loan or a beneficiary, direct or indirect, of a loan granted to any shareholder denoted in Paragraph (A) of this Article. The term "obligor" shall include the maker, endorser, guarantor, repurchaser under a sale and repurchase agreement, or any party having furnished collateral as security for the loan;
 (3) one who loans money in an amount greater than $1,000 to any shareholder denoted in Paragraph (A) of this Article;
 (4) one whose management or business policies or affairs are subject to direction, whether exercised or not, by any shareholder denoted in Paragraph (A) of this Article;
 (5) any entity five percent or more of whose stock is owned by any shareholder denoted in Paragraph (A) of this Article.
 
 
 [2]
 Manges is also the controlling shareholder at First State Bank, and because of his position as controlling shareholder in the two banks, First State Bank is considered an affiliate of Groos National Bank
 
 
 [3]
 The final order states that ten percent share ownership is to be deemed prima facie control. This is a relaxation of the five percent share ownership criterion of control under the 1973 agreement and under the temporary cease and desist order
 
 
 [4]
 Our review of the Comptroller's findings is provided in the Administrative Procedure Act, 5 U.S.C. §§ 701-706; see 12 U.S.C. § 1818(h)(2)
 
 
 [5]
 Unlike Manges v. Camp, supra, in which the Comptroller attempted to prevent Manges from voting his stock, the regulatory proceeding at issue here did not effectively deprive Manges of property in his stock