OTERO SAVINGS AND LOAN ASSOCIATION, a Colorado corporation, Petitioner,

v.

FEDERAL HOME LOAN BANK BOARD and Federal Savings and Loan Insurance Corporation, Respondents.

No. 80–2346.

United States Court of Appeals, Tenth Circuit.

Argued and Submitted Feb. 17, 1981.

Decided Nov. 13, 1981.

---

Bruce D. Pringle of Baker & Hostetler, Denver, Colo. (James A. Clark of Baker & Hostetler, Denver, Colo., Gailor, Elias & Matz, Washington, D. C., and Law, Scheid & Farabee, Denver, Colo., were also on the brief), for petitioner.

Rosemary Stewart, Trial Atty., Office of the Gen. Counsel, Washington, D. C. (Ralph W. Christy, Senior Associate Gen. Counsel, Larry M. Berkow and Harvey Simon, Associate Gen. Counsel, Federal Home Loan Bank Board, Washington, D. C., were also on the brief), for respondents.

Before HOLLOWAY, McKAY and LOGAN, Circuit Judges.*

## I

LOGAN, Circuit Judge:

### THE LEGALITY OF OTERO'S CHECK-IN PROGRAM UNDER 12 U.S.C. § 1832

Because its accounts are insured by the FSLIC, Otero is deemed an "insured institution" within the meaning of 12 U.S.C. § 1724, and is therefore a "depository institution" by definition under 12 U.S.C. § 1832(b)(5). As such, Otero is subject to § 1832(a), which provides:

(a) No depository institution shall allow the owner of a deposit or account on which interest or dividends are paid to make withdrawals by negotiable or transferable instruments for the purpose of

---

* There is a divergence of views on some issues before us. The various separate opinions which follow express those views and the concurrence of a majority of the panel in the conclusion stated, *infra*. Our opinion in a related case is being filed today in No. 80–1946, *Otero Savings and Loan Association, et al. v. The Federal Reserve Bank of Kansas City*, Missouri, 665 F.2d 275 (10th Cir. 1981).

making transfers to third parties, except that such withdrawals may be made in the States of Massachusetts, Connecticut, Rhode Island, Maine, Vermont, New York, New Jersey, and New Hampshire.

Otero argues that its two-account ATS system does not violate 12 U.S.C. § 1832(a), reading that section as applying only to NOW accounts, that is, single account systems in which interest or dividends are paid directly upon savings accounts from which withdrawals by negotiable instruments are permitted.

■ We believe a fair reading of the language of 12 U.S.C. § 1832(a) indicates that no depository institution may offer an interest bearing demand deposit account, whether operated directly as a one-account NOW system or indirectly as a two-account ATS system. The statutory language is broad enough to apply to both types of accounts. We have found nothing in the legislative history of this provision, enacted in 1973, to indicate that Congress intended to differentiate between the two types of accounts. It is true that Congress treated ATS and NOW systems separately in later legislation. But the legislative history of subsequent acts is of dubious value in interpreting an act passed six years earlier. *See Haynes v. United States*, 390 U.S. 85, 87 n.4, 88 S.Ct. 722, 725 n.4, 19 L.Ed.2d 923 (1968); *United States v. Price*, 361 U.S. 304, 313, 80 S.Ct. 326, 331, 4 L.Ed.2d 334 (1960); *United States v. United Mine Workers*, 330 U.S. 258, 282, 67 S.Ct. 677, 690, 91 L.Ed. 884 (1947).

It is also a fact that the congressional reports treating the original enactment of 12 U.S.C. § 1832 refer only to NOW accounts, and it may be, as represented to us at oral argument, that no savings and loan was using anything but NOW accounts at the time of that legislation. No doubt the NOW account development in New

England and the threat of competitive inequality between savings and loan associations and commercial banks was the impetus to congressional action. This does not, however, limit the general language of § 1832 which we construe as forbidding depositor withdrawals from interest bearing accounts via negotiable or transferable instruments payable to third parties, whether accomplished directly under the NOW format or indirectly under the ATS format.

Otero's strongest argument focuses on the interrelationship between 12 U.S.C. §§ 371a and 1832(a) after 1979 legislation. It argues that § 1832(a) must not be read to prohibit ATS accounts because such an interpretation would nullify the 1979 amendments to § 371a. The 1979 amendments expressly allow member banks to offer ATS accounts after December 31, 1979, while § 1832(a) prohibits all depository institutions from offering such accounts until after December 31, 1980.[2] Thus, Otero contends we must reject the broad reading of section 1832 to avoid rendering a legislative enactment a nullity. *See F.T.C. v. Manager, Retail Credit Co.*, 515 F.2d 988, 994 (D.C.Cir.1975); *General Motors Acceptance Corp. v. Whisnant*, 387 F.2d 774 (5th Cir. 1968); *Abbot v. Bralove*, 176 F.2d 64 (D.C. Cir.1949).

We find no fatal inconsistency between section 371a, as amended, and the broad reading of section 1832, however. The general language in section 1832, prohibiting any depository institution from offering interest bearing demand deposit accounts or their equivalents, either NOW or ATS accounts, must give way to the specific language of section 371a, granting federal reserve member banks authority to offer ATS accounts after December 31, 1979. *See Busic v. United States*, 446 U.S. 398, 100 S.Ct. 1747, 64 L.Ed.2d 381; *Morton v. Mancari*, 417 U.S. 535, 94 S.Ct. 2474, 41

---

**2.** The 1979 amendment to § 371a was only effective December 31, 1979 to March 31, 1980. On March 31, 1980, Congress enacted the Depository Institutions Deregulation and Monetary Control Act of 1980, Pub.L.No.96–221, 94 Stat. 132 *et seq.*, (amending scattered sections of Title 12 U.S.C.). The Act extended the effect

of the 1979 amendment to § 371a indefinitely and modified § 1832(a) by allowing all depository institutions to permit withdrawals from interest bearing accounts, except accounts of for-profit corporations, by negotiable or transferable instruments payable to third parties after December 31, 1980.

L.Ed.2d 290 (1974). The legislative history of the Depository Institutions Deregulation Act of 1980 offers no explanation for Congress' disparate treatment of granting federal reserve member banks ATS privileges one year earlier than all other federally insured depository institutions. The underlying policy reasons for granting member banks a one year head start do not concern us.

▉ At oral argument no constitutional arguments were made against the application of 12 U.S.C. § 1832 to this Colorado-based savings and loan association. Such arguments were made to the Bank Board, however, in administrative proceedings and in briefs filed there, and the constitutional issue was treated in the Bank Board's decision. Any constitutional argument must be based upon the exception provided for eight northeastern states from the prohibitions in 12 U.S.C. § 1832, or the inconsistency between the treatment of commercial banks and savings and loan associations during 1980. We agree with the Bank Board that the governing principle is stated in *New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976); a rational basis classification test is applicable. Here there is no inherently suspect classification, nor is a fundamental interest involved; this is solely an economic regulation governing financial institutions. Congress has undisputed authority to legislate in this area and may make reasonable distinctions between its treatment of commercial banks and savings and loans. It may also experiment by allowing particular types of accounts in one region of the country before extending the rule to others. We think there is no constitutional problem here.

Thus we hold 12 U.S.C. § 1832(a) applies to prohibit Otero's "Check-In" ATS type account during 1980, and that section is constitutional.

II

HOLLOWAY, Circuit Judge:

## THE VALIDITY OF THE REMEDIAL ORDER OF THE BANK BOARD

Two issues are presented by the challenges to the remedial order of the Federal Home Loan Bank Board: (1) whether the Bank Board has power to enforce 12 U.S.C. § 1832 by orders entered in cease and desist proceedings brought under 12 U.S.C. § 1730(e)(1); and (2) whether the remedial order, particularly the two hundred sixty-eight day ban on the opening of new Check-In accounts, NOW accounts or similar programs by Otero, is within the scope of the Bank Board's powers.

### A

### *The FSLIC's power to enforce § 1832*

The Bank Board argues that it may enforce § 1832 by means of cease-and-desist proceedings pursuant to 12 U.S.C. § 1730(e)(1).[3] Section 1730(e)(1) permits the FSLIC to act where an institution has violated or is about to violate "a law, rule, or regulation." The Bank Board contends that under § 1730(e)(1) the FSLIC may bring cease-and-desist proceedings to stop

---

**3.** 12 U.S.C. § 1730(e)(1) provides in part:

If, in the opinion of the Corporation, any insured institution, institution which has insured accounts or any director, officer, employee, agent, or other person participating in the conduct of the affairs of such institution is engaging or has engaged, or the Corporation has reasonable cause to believe that the institution or any director, officer, employee, agent, or other person participating in the conduct of the affairs of such institution is about to engage, in an unsafe or unsound practice in conducting the business of such institution, or is violating or has violated, or the Corporation has reasonable cause to believe that the institution or any director,

officer, employee, agent, or other person participating in the conduct of the affairs of such institution is about to violate, *a law, rule, or regulation,* or any condition imposed in writing by the Corporation in connection with the granting of any application or other request by the institution or any written agreement entered into with the Corporation, including any agreement entered into under section 1726 of this title, the Corporation may issue and serve upon the institution or such director, officer, employee, agent, or other person a notice of charges in respect thereof. . . .

(Emphasis supplied).

the violation of any law. Otero, on the other hand, claims that only those statutes which expressly provide that they may be enforced by the FSLIC or the Bank Board are enforceable under § 1730(e). Section 1832 contains no such delegation of authority, and indeed says nothing as to who is to enforce it. Therefore, Otero argues, only the Attorney General may enforce § 1832 in accordance with 28 U.S.C. § 516, which provides:

> Except as otherwise authorized by law, the conduct of litigation in which the United States, an agency, or officer thereof is a party, or is interested, and securing evidence therefor, is reserved to officers of the Department of Justice, under the direction of the Attorney General.

*See also* 28 U.S.C. § 519.

In support of its argument that violation of a law is remediable by the FSLIC only if the law itself specifically so provides, Otero cites a number of statutes which, unlike § 1832, specify that they are to be enforced by the Bank Board or the FSLIC by means of its § 1730(e) powers. For example, the Truth-in-Lending Act authorizes the Board of Governors of the Federal Reserve System to prescribe rules and regulations implementing that Act. 15 U.S.C. § 1604. As to enforcement the Act provides in pertinent part that:

> (a) Compliance with the requirements imposed under this subchapter shall be enforced under"
>
> \*   \*   \*   \*   \*   \*
>
> (2) sections 1426(i), 1437, 1464(d), and 1730 of Title 12, by the Federal Home Loan Bank Board (acting directly or through the Federal Savings and Loan Insurance Corporation), in the case of any institution subject to any of those provisions.

15 U.S.C. § 1607(a)(2).

Similar statutory schemes under which another body has rulemaking authority while the Bank Board is specifically directed to enforce compliance by insured institutions under § 1730(e) include the Electronic Funds Transfer Act, 15 U.S.C. § 1693*o*(a)(2),

the Debt Collection Practices Act, 15 U.S.C. § 1692*l* (b)(2), the Equal Credit Opportunity Act, 15 U.S.C. § 1691c(a)(2), the Home Mortgage Disclosure Act, 12 U.S.C. § 2804(b)(2), and the Depository Institution Deregulation and Monetary Control Act of 1980, Pub.L. 96–221, § 208(a)(2). The Community Reinvestment Act, 12 U.S.C. §§ 2901–2905, provides that the Bank Board shall promulgate regulations and enforce its provisions as to FSLIC-insured institutions. Under the Depository Institution Management Interlocks Act, the Bank Board is given primary responsibility for enforcement but is permitted to refer matters to the Attorney General. 12 U.S.C. § 3206(4), (6). Finally, the Bank Secrecy Act applies to, among other entities, FSLIC-insured institutions, but charges the Secretary of the Treasury with the responsibility of assuring compliance, with the proviso that he may delegate this authority to the appropriate supervisory agency. 31 U.S.C. § 1054(a).

The specific delegations of enforcement authority contained in these acts indicate, Otero argues, that where Congress has intended to grant enforcement authority to the FSLIC, contrary to the general presumption that federal laws are to be enforced by the Attorney General, it has done so explicitly. Interpreting § 1730(e) as giving the FSLIC authority to enforce any law would leave the specific delegations discussed above as mere surplusage, Otero contends.

The Bank Board in its Decision and Order rejected Otero's contention, stating:

> We are not persuaded by this argument since the specific delegation language cited by Otero . . . can also be justified as providing a clear legal basis for the Corporation to use enforcement mechanisms other than cease and desist orders where statutes relating to those mechanisms do not contain the "a law" language of § 1730(e)(1).
>
> Moreover, some of the cited delegations seem clearly designed to specify that only the Bank Board, rather than some other regulatory agency, shall have enforcement authority with respect to FSLIC-in-

sured associations, where the statute in question might otherwise have left that question in doubt.

Decision and Order at 16.

It does not appear that the specific delegations in the statutes cited above would be strictly necessary if the Bank Board's broad interpretation of § 1730(e) is correct. However, Otero goes too far in arguing that this necessarily implies that the FSLIC may only enforce those statutes that contain such specific delegations of authority. These specific delegations could still serve a useful function in clarifying the FSLIC's authority, especially in the case of statutes which apply to a number of different types of institutions subject to the control of different regulatory agencies, and statutes vesting rulemaking and enforcement authority in different agencies.

The Bank Board's decision relied heavily on *Reich v. Webb*, 336 F.2d 153 (9th Cir.), *cert. denied*, 380 U.S. 915, 85 S.Ct. 890, 13 L.Ed.2d 800. *Reich* involved, *inter alia*, a dispute over the extent of the Bank Board's enforcement authority over federal savings and loans pursuant to 12 U.S.C. § 1464(d)(1), which then provided in pertinent part:

> The Board shall have power to enforce this section and rules and regulations made hereunder. In the enforcement of any provision of this section or rules and regulations made hereunder, or any other law or regulation, and in the administration of conservatorships and receiverships as provided in paragraph (2) of this subsection, the Board is authorized to act in its own name and through its own attorneys.

The court in *Reich* rejected the argument that the statutory phrase "or any other law or regulation" must in light of the doctrine of *ejusdem generis* " 'necessarily refer to "any other law or regulation" which Congress has expressly directed the Board to enforce and which covers the same subject

matter as is contained in the statute and regulations of the Board.' " *Id.* at 157. The court instead concluded that given the Bank Board's broad authority over federal savings and loan associations it had the power under § 1464(d)(1) to bring suit to redress breaches of common law fiduciary duties by those controlling such associations. *Id.* at 158.

Similarly, in *National State Bank, Elizabeth, N. J. v. Long*, 630 F.2d 981, 988 (3rd Cir.), the court held that 12 U.S.C. § 1818(b)(1) confers jurisdiction on the Comptroller of the Currency to enforce compliance with a New Jersey anti-redlining statute by national banks located in that state. The pertinent language of § 1818(b)(1) is identical to that contained in § 1730(e)(1), as well as that in § 1464(d)(2), which empowers the Bank Board to issue cease-and-desist orders against federal savings and loan associations.

Concededly, Otero, as a state-chartered institution, is not subject to the same all-encompassing regulation "from its cradle to its corporate grave," *California v. Coast Federal Savings & Loan Ass'n*, 98 F.Supp. 311 (S.D.Cal.), as are federally chartered institutions such as those involved in *Reich* and *National State Bank*. For example, the court in *National State Bank* went on to hold that the Comptroller's power to enforce the New Jersey statute was exclusive, and that the Commissioner of the Department of Banking of New Jersey was thus precluded from enforcing the statute against a national bank. 630 F.2d at 988–89. *See also Conference of Federal Savings and Loan Associations v. Stein*, 604 F.2d 1256, 1260 (9th Cir.), *aff'd* 445 U.S. 921, 100 S.Ct. 1304, 63 L.Ed.2d 754 (state agencies have no enforcement power over federal savings and loan associations). Obviously, the fact that a state chartered institution such as Otero is insured by the FSLIC does not divest the appropriate state agencies of jurisdiction over it.[4]

---

4. In promulgating § 1730(e) as part of the Financial Institutions Supervisory Act of 1966, Congress explicitly recognized the dual nature of federal and state regulation of state savings

and loan associations by enacting § 1730(*o*), which provides:

> In connection with any proceeding under subsection (e), (f)(1), or (g) of this section

Nevertheless, the language of § 1730(e)(1), which refers to violations of "a law", is quite broad. On its face, the term is not limited to statutes which explicitly grant enforcement powers to the FSLIC. We agree with the interpretation by the Bank Board and the FSLIC that the term includes § 1832, although we do not say that such enforcement powers embrace every type of statute.

■ We cannot agree with Otero's further argument that its interpretation of § 1730(e) does not weaken the FSLIC's ability to "discharge its basic mission of ensuring the safe and sound operation of insured institutions," [5] because the FSLIC may always use § 1730(e) to redress "an unsafe or unsound practice", regardless of whether any law is violated. Otero's position would complicate enforcement by requiring the FSLIC to demonstrate the unsafeness or unsoundness of a violation of a law such as § 1832. Furthermore, the coherence of the regulatory scheme would be disrupted by a holding that § 1832 can only be enforced by the Attorney General. Given the broad language of § 1730(e), we hold that the FSLIC, with its expertise in financial matters, may use its cease-and-desist powers to remedy violations of § 1832 which expresses an important policy on regulation of the operation of state chartered insured institutions, along with others covered by the Act.[6]

Therefore we conclude that the FSLIC and the Bank Board have power under § 1730(e) to enforce the prohibitions of § 1832.

### B

### *The propriety of the Bank Board's remedial order*

The Bank Board's order required Otero to take the following steps:

(1) Otero shall immediately close all Check-In accounts which do not consist solely of funds in which the entire beneficial interest is held by one or more individuals or by an organization which is operated primarily for religious, philanthropic, charitable, educational, or other similar purposes and which is not operated for profit.

(2) Otero shall immediately cease until the two hundred sixty-eighth (268th) day following the effective date of this Order:

(a) The opening of any additional Check-In accounts;

(b) The initiation of any program providing for negotiable orders of withdrawal from Otero savings accounts; and

(c) The operation of any other kind of program designed to permit withdrawals from interest-bearing accounts by negotiable or transferable instruments for the purpose of making transfers to third parties.

(3) For a period of two hundred sixty-eight (268) days commencing on the effective date of this Order, Otero's advertisement or promotion of Check-In accounts or of any other program specified in (2)(b) or (2)(c) above shall comply with the principles set forth in Bank Board Resolution No. 80–614, applied as if the date two hundred sixty-eight (268)

---

involving an insured State-chartered institution or any director or officer or other person participating in the conduct of its affairs, the Corporation shall provide the appropriate State supervisory authority with notice of the Corporation's intent to institute such a proceeding and the grounds therefor. Unless within such time as the Corporation deems appropriate in the light of the circumstances of the case (which time must be specified in the notice prescribed in the preceding sentence) satisfactory corrective action is effectuated by action of the State supervisory authority, the Corporation may proceed as provided in this section. No institution or other party who is the subject of any notice or order issued by the Corporation under this section shall have standing to raise the requirements of this subsection as ground for attacking the validity of any such notice or order.

5. Supplemental Brief of Otero Savings and Loan Association at 13, R.238.

6. We need not decide what role the FSLIC has in assuring that state chartered institutions comply with state laws, which are of course primarily the responsibility of state agencies.

days after the effective date of this Order were substituted for the date of December 31, 1980 in said Resolution.

Decision and Order at 23.

Given our conclusion that Check-In accounts have never been and are not currently legally available for "for profit" organizations, and our conclusion that the FSLIC may use its cease-and-desist powers to enforce § 1832, the first paragraph of the Bank Board's order requiring the closing of "for profit" organizations' accounts is clearly proper. Otero, however, argues further that the two hundred sixty-eight day moratorium on the opening of any new Check-In, NOW, or similar accounts, and the related restrictions on advertising of such accounts, are beyond the scope of the Bank Board's powers. The FSLIC says that the order is proper under § 1730(e)(1) which provides in part that:

> ... Such order may, by provisions which may be mandatory or otherwise, require the institution or directors, officers, employees, agents, and other persons participating in the affairs of such institution to cease and desist from the same, *and further to take affirmative action to correct the conditions resulting from any such violation or practice.* (Emphasis supplied).

The Bank Board claims that the "conditions resulting from" Otero's commencement of its Check-In program before it was legally permissible include an unfair advantage over its law-abiding competitors, and that its order serves to correct the imbalance by giving the competitors a chance to catch up.[7] The Bank Board asserts that its remedial powers are equivalent to those of the National Labor Relations Board to redress unfair labor practices by ordering "such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this subchapter ...." National Labor Relations Act, § 10(c), 29 U.S.C. § 160(c). The National Labor Relations Board's power has been held to authorize a wide variety of remedies, such as a requirement that a company offer employment to certain persons, *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271, and an order that a company union be dissolved and that the company reimburse its employees for the dues they paid, *Virginia Electric & Power Co. v. NLRB*, 319 U.S. 533, 63 S.Ct. 1214, 87 L.Ed. 1568.

Otero, on the other hand, asserts that the FSLIC's remedial power does not extend to requiring that an insured institution refrain from otherwise *lawful* conduct. All that the Bank Board can do under § 1730(e)(1) is to order that an institution cease and desist from *unlawful* conduct and take such affirmative action as will correct conditions resulting therefrom and ensure that the institution is law abiding in the future. The language of § 1730(e)(1) is not as broad as the provision in § 10(c) of the National Labor Relations Act authorizing an order for such affirmative action "as will effectuate the policies of this subchapter." In light of the wording and legislative history of the statute involved here, the Bank Board's powers appear more limited.

Prior to passage of the Financial Institutions Supervisory Act of 1966, the Bank Board's only available enforcement tool for state chartered insured institutions was the termination of insurance. 12 U.S.C. § 1730(b). The Senate Banking and Currency Committee in its report on the Act noted that this remedy, in addition to being drastic, is a time-consuming one to implement. Even if insured status is terminated, the institution's existing insured accounts continue to be insured for another two years after termination. As stated in the report:

> During this time the losses of an institution can multiply .... During such period, the Insurance Corporation is without any further remedy to prevent increased losses, no matter what the conduct of those in control of the institution or the additional losses that might be incurred.

---

7. The two hundred sixty-eight day period equals the length of time from April 7, 1980, to December 31, 1980, during which Check-In accounts were illegally offered by Otero.

S.Rep.No.1482, 89th Cong., 2d Sess., *reprinted in* [1966] U.S.Code Cong. & Ad.News 3532, 3538.

■ Congress's intent in creating cease-and-desist powers was to grant the Bank Board and the other federal agencies supervising banks and savings and loan associations "additional flexible and effective supervisory powers ..., *within carefully guarded limits*, in order to make sure that our banks and savings and loan associations would continue to serve the Nation effectively and well." *Id.*, [1966] U.S.Code Cong. & Ad.News at 3538 (emphasis added). Section 1730(e) enables the Bank Board to redress the direct effects of unlawful conduct in an expeditious and effective manner. As stated by the court in *FSLIC v. Fielding*, 309 F.Supp. 1146, 1149 (D.Nev.), *cert. denied* 400 U.S. 1009, 91 S.Ct. 567, 27 L.Ed.2d 622:

> The Congressional reports repeatedly emphasized the importance of the division of regulatory power between the national and state governments. *The purpose of the enforcement provisions is to quickly stop fraudulent practices, not to affirmatively recover for them.* (Emphasis supplied).

■ In short, the Act only permits the Bank Board to ensure that institutions conduct their affairs in a legal, safe and sound manner. It does not give the Board a mandate to use whatever means seem desirable to maintain the competitive balance among financial institutions.

This conclusion is consistent with cases construing the Comptroller's power over national banks under 12 U.S.C. § 1818(b)(1), the language of which pertaining to the authority to mandate affirmative action is identical to that of § 1730(e)(1), and which was passed as part of the same Act. In *First National Bank of Eden, South Dakota v. Department of the Treasury, Office of the Comptroller of the Currency*, 568 F.2d 610 (8th Cir.), the Comptroller determined, *inter alia*, that the bank in question had engaged in unsafe and unsound practices by paying excessive salaries and bonuses to its executive officers. The court rejected the bank's challenge to the portion of the Comptroller's order requiring that the bank limit future personnel expenses to 1.5% of average assets and requiring reimbursement of $61,000 paid out in bonuses. *Id.* at 611–12. Unlike the penalty provision in this case, the Comptroller's order in *First National Bank of Eden* was properly directed to preventing future specified abuses and reversing the direct, identifiable effects of the past practices on the bank's financial soundness.

Similarly, in *Groos National Bank v. Comptroller of Currency*, 573 F.2d 889 (5th Cir.), the court upheld an order prohibiting future extensions of credit by a bank to its controlling shareholder, in accordance with a prior agreement between the Comptroller, the bank, and the shareholder. The court rejected the argument that the order was overbroad because there was no substantial evidence that the bank's continued dealings with the shareholder constituted unsafe and unsound banking practices. The court held that:

> Substantial evidence is required for the Comptroller's findings, but once the Comptroller finds a violation *he may, within his allowable discretion, fashion relief in such a form as to prevent future abuses* .... [Citation omitted]. We find no abuse of discretion in this order, which encompasses the essential elements of the earlier agreement *and which clearly relates to problematic practices that have occurred in the past.* (Emphasis added).

*Id.* at 897. The order thus addressed prevention of future identified *unlawful* practices. (Emphasis added).

The Bank Board argues that if its penalty provision is struck down, Otero will have succeeded in violating the law with impunity by jumping the gun in offering its Check-In program prior to December 31, 1980. In its Decision and Order the Bank Board stated:

Due to the length of time inherent in any cease and desist proceeding,[8] Otero's interpretation would mean that a party could violate the existing statute, well in advance of the effective date of amendments, knowing that the cease and desist process could not be brought to bear before the arrival of the effective date. Whatever legislative purpose may have been served in delaying the effective date would, to a large extent, be thwarted. Decision and Order at 21.

However, cease-and-desist orders usually suffer from the defect that violators have already committed unlawful acts. Moreover, here § 1832(c) would permit fines for each past violation of § 1832.[9] In any event, even if Otero's past actions go unpunished, this does not justify expanding the Bank Board's powers beyond those granted by the statute.

■ Thus the Board's remedial order cannot be upheld. It is true that "the relation of remedy to policy is peculiarly a matter for administrative competence," *American Power & Light Co. v. SEC*, 329 U.S. 90, 112, 67 S.Ct. 133, 145, 91 L.Ed. 103, quoting *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 194, 61 S.Ct. 845, 852, 85 L.Ed. 1271, and the agency's knowledge, expertise and choice of remedy must be given special respect. *NLRB v. Gissell Packing Co.*, 395 U.S. 575, 612 n.32, 89 S.Ct. 1918, 1939 n.32, 23 L.Ed.2d 547. *see also Moog Industries, Inc. v. FTC*, 355 U.S. 411, 413–14, 78 S.Ct. 377, 379, 2 L.Ed.2d 370. Nevertheless, the provisions of § 1730(e)(1) authorizing orders to cease and desist, and to take affirmative action to correct conditions resulting from violations of law or unsafe or unsound practices, do not grant power to restrict presently lawful conduct in attempting to read-

just competitive conditions claimed to have been disturbed by past conduct. Such power to adjust for competitive effects of past conduct by a penalty box remedy is not contemplated by the statute. Moreover, rather than effecting an adjustment of the claimed competitive imbalance, the order might result in numbers of individual customers using new non-interest bearing accounts with Otero during the penalty period. The order could thus penalize Otero's customers, rather than Otero. Therefore the penalty provisions of paragraphs (2) and (3) of the order cannot stand.

### Conclusion

In sum, we uphold the Bank Board's conclusion that Otero's Check-In program violated 12 U.S.C. § 1832. The Decision and Order is affirmed as to paragraph (1) requiring the closing of all of Otero's Check-In accounts not consisting solely of funds in which the beneficial interest is held by individuals or non-profit organizations. In all other respects the Decision and Order is set aside.

McKAY, Circuit Judge, concurring:

No explanation of the legislation governing what amounts to, in one form or another, third party check withdrawals from savings accounts is entirely satisfactory, and delving too deeply into the legislative history of these sections raises, perhaps, more questions than it answers. Therefore, it seems appropriate to state separately my reasons for agreeing with the result reached by the court. The mischief probably is rooted in the fact that a debating body such as Congress could not respond swiftly enough with regulations to accommodate the sophisticated devices designed

8. Temporary cease-and-desist orders under 12 U.S.C. § 1730(f)(1) may be issued only where a violation "is likely to cause insolvency or substantial dissipation of assets or earnings of the institution, or is likely to seriously weaken the condition of the institution or otherwise seriously prejudice the interests of its insured members prior to the completion of the proceedings conducted pursuant to paragraph (1) of subsection (e) of this section . . . ."

9. The Bank Board's Decision and Order discussed the possibility of assessing a fine but did not in fact impose one. Decision and Order at 21–22. Before the Board the FSLIC's general counsel and Otero differed as to whether the Bank Board has the power to assess fines under § 1832(c) or whether the Attorney General must bring an action to impose a fine. The Bank Board did not answer this question and we need not address it here.

by depository institutions to circumvent comprehensive legislation. Therefore, the congressional legislation evolved in a piecemeal fashion so that sometimes one enactment overlapped or did not quite match another. In order to elicit a rational marketplace meaning of the various acts and amendments, it is necessary to avoid the usual detailed refinements of comparative statutory history that have normally been the hallmark of judicial work. Instead, we must emphasize the objectives of Congress without over-emphasizing the individual steps taken to achieve those ends. While the general objectives of Congress remain elusive, they can reasonably be derived from the legislative history, statutory language, and overall structure of the legislation. In the Acts at issue here, too much attention to precision in the use of statutory language would lead to the unwise effect of holding that Congress failed in the one objective that seems clearest, that is, the objective of putting all regulated financial institutions on an equal competitive footing in offering what amounts to, in whatever form, check withdrawals from interest-bearing accounts. The title of the 1980 Depository Institutions Deregulation and Monetary Control Act evidences this overriding objective.

The 1980 Act represented a reversal of the previous legislative position, first manifested in 1933 with the enactment of 12 U.S.C. § 371a, which prohibited all check withdrawals from interest-bearing accounts. That section expressly forbade federally-insured banks from granting demand access to interest-bearing accounts either "directly or indirectly, by any device whatsoever." Sometime thereafter, in a handful of northeastern states, state-chartered financial institutions began offering what are currently known as Negotiable Order of Withdrawal (NOW) accounts to accomplish this objective. Responding to those developments, Congress enacted 12 U.S.C. § 1832(a) in 1973. While it did not use the sweeping "directly or indirectly" language of § 371a, it is reasonable in light of the history of the Act to conclude that no negative pregnant was intended. The pur-

pose of § 1832(a) was to prevent all such devices explicitly, except in the states where local competitive advantage had to be met because state-chartered institutions were already offering such accounts. By 1979 Congress had concluded that banks generally should be permitted to allow check access to savings accounts. While it is true that the description of devices used in the 1979 amendment to 12 U.S.C. § 371a spoke of what commonly are referred to as Automatic Fund Transfer (AFT) accounts, Congress' apparent intent was simply to permit instant access to savings accounts through the checking device. That amendment was effective only until March 31, 1980. In the meantime, Congress was forced to deal comprehensively with the regulations authorizing various banking services, after the United States Court of Appeals for the District of Columbia, in an unpublished opinion, struck down Federal Reserve Board regulations that authorized a variety of innovative banking services. The court stayed the effectiveness of its action to allow Congress time to act. In response, Congress adopted the Depository Institutions Deregulation and Monetary Control Act of 1980, Pub.L.No.96–221, § 303, 94 Stat. 146 (1980). Under this Act, an amendment to 12 U.S.C. § 1832, effective December 31, 1980, allowed all depository institutions to "permit the owner of a deposit or account on which interest or dividends are paid to make withdrawals by negotiable or transferable instruments for the purpose of making transfers to third parties." Congress also extended the 1979 amendments to 12 U.S.C. § 371a, which gave federally-insured banks authority to offer AFT accounts. These amendments would have expired by their own terms on March 31, 1980, leaving a gap between that date and the effective date of the sweeping new legislation.

One can rationally argue that it is significant that the amendment to § 371a was extended indefinitely rather than merely until December 31, 1980, when § 1832, authorizing all depository institutions to offer check access to savings accounts, became

effective. Considered out of the context of the overall scheme, this suggests that § 371a dealt only with AFT accounts, while § 1832 covered only NOW accounts. However, to credit this argument ignores Congress' obvious overall purpose of eliminating competitive advantage among financial institutions in providing check access to savings accounts. When considered in context, I am satisfied that when Congress originally enacted § 1832, it intended to permit savings and loan institutions in certain named states to offer special programs not generally allowed in order that they could compete with state-chartered institutions. I am also satisfied that for whatever reason, when Congress amended § 371a in 1979, it intended to grant that same competitive advantage to federally-insured banks, without extending that advantage to other institutions. The language and chronological sequence of the statutory sections dealing with check access to savings accounts suggests that the disparities arising from this type of piecemeal legislation caused Congress eventually to conclude that it should reverse its original position, which prevented essentially all checking access to savings accounts, and instead to authorize such services for all financial institutions under its control, effective December 31, 1980.

From this history we glean the following: Prior to 1973, no federally-regulated financial institutions were authorized to permit check access to savings accounts. After 1973 only the depository institutions in the states expressly exempted in the 1973 enactment of § 1832(a) were permitted check access to savings accounts. Beginning with the 1979 amendments, federally-insured banks were added to the limited list of those permitted check access to savings accounts. Finally, on December 31, 1980, all remaining federally-regulated financial institutions were added to the list. At least from the enactment of § 1832(a) in 1973 and in all probability by implication before that date, all federally-regulated financial institutions were forbidden from offering check access to savings accounts unless expressly exempted under that section or its subsequent amendments, or under § 371a. Thus, at least from 1973 until December 31, 1980, Otero was forbidden by § 1832(a) from offering any program that effectively allowed check access to savings accounts.

I agree with the court's analysis of the constitutional questions raised but find it necessary to state separately my views on remedies. I agree with Part IIA of the court's opinion, finding that the Bank Board's cease-and-desist powers were appropriately exercised in this situation. I also agree with the conclusion in Part IIB that the Bank Board lacks authority to impose the compensatory penalty box remedy over and above its cease-and-desist order. My reasons for this conclusion, however, differ from those stated by the court. I am persuaded by the Fifth Circuit's analysis in *Gulf Federal Savings and Loan v. Federal Home Loan Bank Board*, 651 F.2d 259 (5th Cir. 1981), construing 12 U.S.C. § 1464(d)(2)(A), which gives the Bank Board the same enforcement powers allowed the Federal Savings and Loan Insurance Corporation (FSLIC) in § 1730(e). Based on its analysis of the legislative history, the Fifth Circuit determined that the principal purpose of providing an enforcement scheme to federal agencies responsible for insuring deposits in financial institutions was to eliminate practices that might undermine the financial stability of insured institutions. The court points out that cease-and-desist authority was given to these agencies to counter unsafe or unsound practices and to allow the agencies to deal swiftly when federal insurance liability might be implicated. While that court expressly reserved a ruling on whether cease-and-desist power would lie in cases involving a violation of law that did not amount to an unsafe and unsound practice, I believe that Congress intended to permit cease-and-desist orders for any clear violation of federal regulatory law, as was involved in this case. I doubt, however, that Congress intended to grant the Bank Board authority to impose implied remedies for practices other than those that are unsafe or unsound. Obviously, gaining a competitive advantage in the market is

neither unsafe nor unsound for the financial future of Otero or the other savings and loans involved in this action. I therefore conclude that the Bank Board has no implied power to attempt to correct a marketplace imbalance created by an illegal practice, although the Board would have such authority to correct any unsafe and unsound conditions created by an illegal practice.

For the reasons stated, I agree with the court's disposition of this case.

LOGAN, Circuit Judge, concurring in part, dissenting in part.

I fully concur in all parts of the majority opinion except that portion of part II, subsection B holding that the Federal Home Loan Bank Board may not prohibit Otero from opening new Check-In, negotiable order of withdrawal, or similar accounts for a 268-day period. The statutory provision and the cases upon which the majority relies to strike down the order in my opinion, instead, lend support to it.

The issue here is the scope of the Bank Board's remedial authority beyond cease-and-desist orders. Under 12 U.S.C. § 1730(e)(1) the Bank Board has power "to take affirmative action to correct the conditions resulting from any such violation or practice." To be sure, this grant is narrower than that given to the National Labor Relations Board (NLRB) under section 10(c) of the National Labor Relations Act, 29 U.S.C. § 160(c). But I believe that under the facts of this case the Bank Board's power is sufficiently broad to support imposing a moratorium on new accounts.

The legislative history of section 1730 does not address the permissible scope of affirmative action. See S.Rep.No.1482, 89th Cong., 2d Sess., reprinted in [1966] U.S.Code Cong. & Ad.News 3532. The majority relies upon an Eighth Circuit case and a Fifth Circuit case that apply the language of 12 U.S.C. § 1818(b)(1), which is identical in all essential respects to the wording of section 1730(e)(1). Both cases recognize the Bank Board's power to require affirmative action to correct the conditions resulting from an illegal, unsafe, or unsound practice. First National Bank of Eden v. Department of the Treasury, 568 F.2d 610 (8th Cir. 1978), upheld the Comptroller's limitation on a bank's expenditure for executive salaries and bonuses to 1.5% of its average assets and the requirement that the bank president and vice-president repay earlier bonuses the Bank Board thought were excessive. Groos National Bank v. Comptroller of the Currency, 573 F.2d 889 (5th Cir. 1978), upheld the Comptroller's prohibition of bank loans to a controlling shareholder and those connected with him. In neither Bank of Eden nor Groos did the court limit the Bank Board's power to insuring merely that the financial institution's future conduct would be within the bounds of the law, the limit the majority indicates in the instant case.

At the time of the Bank Board's order, December 18, 1980, it could have required Otero to close all new accounts Otero had wrongfully gained. The Board rejected this remedy because only a few days later the accounts would become legal; also the Board was concerned with delays inherent in implementing an order, the inconvenience to those who had innocently opened new accounts with Otero, and the danger to Otero's safety and soundness that could result from widespread withdrawals.

In considering the scope of its affirmative remedial power, the Bank Board determined that the statute Otero violated, 12 U.S.C. § 1832(a), was designed by Congress "to limit competitive inequality and that the December 31, 1980 effective date of the amendments to the section was intended to allow all affected associations 'to reach the starting gate' at the same time."

The Bank Board could have carried out the conceived congressional purpose by requiring Otero to divest itself of the accounts gained prior to December 31, 1980, despite their being lawful after that date. But the inconvenience to innocent account holders and possible jeopardy to the safety and soundness of Otero counsel against this alternative. The moratorium order the Bank Board devised to correct the unfair

advantage gained by Otero's illegal entry into the market for interest bearing checking accounts was to exclude Otero from that market for a similar period of time. If the remedy should work ideally, Otero would be deprived of new accounts equal to those wrongfully gained. The likely effect, however, will be to deprive Otero of fewer new accounts than it gained during its illegal "head start" period since by now the most interested prospects will have established such accounts at some financial institution.

The majority views the moratorium on new accounts as punitive rather than remedial. Reviewing analogous NLRB orders, the Supreme Court has considered them as punitive and beyond the power of the agency when the orders neither remove the consequences of violation nor dissipate the effects of the prohibited action. *Local 60, United Brotherhood of Carpenters and Joiners of America v. NLRB*, 365 U.S. 651, 655, 81 S.Ct. 875, 877, 6 L.Ed.2d 1 (1961). This test seems applicable to the Bank Board, since it is authorized to take affirmative action to correct conditions resulting from illegal, unsafe, or unsound practices. Under this test the moratorium is not punitive because it will correct at least partially the effect of the violations.

Under the circumstances of this case I would give weight to the familiar rule the majority cites, that an administrative agency's knowledge, expertise, and choice of remedy deserve deference. *See, e. g., NLRB v. Gissell Packing Co.*, 395 U.S. 575, 612 n.32, 89 S.Ct. 1918, 1939 n.32, 23 L.Ed.2d 547 (1969); *Moog Indus., Inc. v. FTC*, 355 U.S. 411, 413, 78 S.Ct. 377, 379, 2 L.Ed.2d 370 (1958). While attempting to remedy Otero's 268-day head start, the Board simultaneously seeks to protect Otero's safety and soundness and to shield the innocent account holders. The Board's remedy may not fully correct Otero's unfair advantage. Nevertheless, I think the statute permits the remedy and the Bank Board did not abuse its discretion in choosing it.

I would affirm the Bank Board's order in all respects.